VAN RENSSELAER HALSEY et al., Individually and as Copartners under the Firm Name of C. D. HALSEY & Co., Respondents, *v.* CLINTON D. WINANT, Defendant, and W. A. HARRIMAN & COMPANY, INC., Appellant.

514

(Argued February 10, 1932; decided March 3, 1932.)

*Martin Conboy, John Vance Hewitt* and *Bernard Sobol* for appellant. The finding of fact, that the transfer of the shares of stock, in full settlement of the indebtedness was for a fair consideration, was not against the weight of evidence. (*Virginia* v. *West Virginia*, 238 U. S. 202; *Hussey* v. *Flanagan*, 237 N. Y. 227; *Nash* v. *Bengtson*, 228 N. W. Rep. 177; *Schlect* v. *Schlect*, 168 Minn. 176; *Steinberg Co.* v. *Pastive*, 129 Atl. Rep. 201; *Castellano* v. *Osborne*, 16 Fed. Rep. [2d] 187; *Bliss Co.* v. *Progressive Smelting & Metal Corp.*, 208 App. Div. 346; *Murray* v. *Judson*, 9 N. Y. 73; *Pratt* v. *Adams*, 7 Paige, 615.) The pledge of 450,000 shares of the capital stock of the Falcon Oil Corporation with defendant-appellant, as security for the loan, was valid and is not subject to attack by the plaintiffs. The transactions between the defendants were not schemes by which defendant-appellant could obtain usurious interest rates. (*Brown* v. *Robinson*, 224 N. Y. 301; *Clarke* v. *Sheehan*, 47 N. Y. 188; *Cockle* v. *Flack*, 93 U. S. 344; *Valentine* v. *Connor*,

40 N. Y. 248; *Orvis* v. *Curtiss*, 157 N. Y. 657; *Hall* v. *Ditson*, 5 Abb. N. C. 198; *Matthews* v. *Coe*, 70 N. Y. 239; *Spain* v. *Talcott*, 165 App. Div. 815; *Blackburn* v. *Hayes*, 59 Ark. 366; *Browne* v. *Vredenburgh*, 43 N. Y. 195; *Grannis* v. *Stevens*, 216 N. Y. 583; *Diehl* v. *Becker*, 227 N. Y. 318.) A lender, not intending to make a usurious contract, may be paid for his trouble, time and expense in obtaining the money for the loan. (*Hartley* v. *Eagle Ins. Co.*, 222 N. Y. 178; *Brown* v. *Robinson*, 224 N. Y. 301; *Thurston* v. *Cornell*, 38 N. Y. 281; *Bennett* v. *Ginsburg*, 141 App. Div. 66; *DeMoltke-Huitfeldt* v. *Garner & Co.*, 145 App. Div. 766; *Miller & Co.* v. *Claridge Manor Co.*, 14 Fed. Rep. [2d] 859; *Stewart* v. *Miller & Co.*, 132 S. E. Rep. 535; *Atlanta Mining & Rolling Mill Co.* v. *Gwyer*, 48 Ga. 9.) Only the borrower personally can come into equity and ask for affirmative relief without offering to pay the amount borrowed with legal interest. (*Post* v. *Bank of Utica*, 7 Hill, 391; *Vilas* v. *Jones*, 1 N. Y. 274; *Rexford* v. *Widger*, 2 N. Y. 131; *Schermerhorn* v. *Talman*, 14 N. Y. 93; *Allerton* v. *Belden*, 49 N. Y. 373; *Wright* v. *Clapp*, 28 Hun, 7; *Dickson* v. *Valentine*, 25 Jones & Spencer, 128; *Wheelock* v. *Lee*, 64 N. Y. 242; *Buckingham* v. *Corning*, 91 N. Y. 525; *Marsh* v. *House*, 13 Hun, 126; *Alden* v. *Diossy*, 16 Hun, 311; *O'Brien* v. *Ferguson*, 37 Hun, 368; *Rice* v. *Schneck*, 189 App. Div. 877; 228 N. Y. 561; *Decalcomanie Transfer Ornaments Co.*, v. *Hajin*, 131 Misc. Rep. 646; *Fort* v. *415 Central Park West Corp.*, 131 Misc. Rep. 774; *Matter of Fishel*, 198 Fed. Rep. 464; *Lubetkin* v. *Stern & Co.*, 223 App. Div. 770; *Yormarck* v. *Waldman*, 127 Misc. Rep. 748.) The plaintiffs should not be permitted to recover on any technical theory of a judgment creditor's lien because of their own wrongful conduct and refusal to do equity. (*Hall* v. *Ditson*, 5 Abb. N. C. 198; *Bliss Co.* v. *Progressive Smelting & Metal Corp.*, 208 App. Div. 346; *Security Bank* v. *Geoghegan*, 174 App. Div. 195; *Mallouk* v. *American Exchange Nat. Bank*, 157 App. Div. 711; 216 N. Y. 670.)

*Carroll G. Walter* and *J. Frederick Eagle* for respondents. The findings of the Appellate Division that the value of the stock was at least $7.50 per share, that defendant-appellant's loan was not a fair equivalent for the stock, and that the stock was transferred to defendant-appellant without a fair consideration, are amply sustained by the evidence. (*Canaday* v. *Arch Amusement Co.*, 179 App. Div. 842; *Brown* v. *Montgomery*, 20 N. Y. 287; *Yates* v. *Hoffman*, 5 Hun, 113; *Fuller* v. *Brown*, 76 Hun, 557.) The findings show an actual intent to defraud the plaintiffs, and the transfer consequently is void even if there were an adequately valuable consideration. (*Brody* v. *Pecoraro*, 250 N. Y. 56; *Baldwin* v. *Short*, 125 N. Y. 553; *Billings* v. *Russell*, 101 N. Y. 226; *Weiser* v. *Kling*, 38 App. Div. 266; *Levy* v. *Hamilton*, 68 App. Div. 277; *Isham* v. *Post*, 141 N. Y. 100; *Coursey* v. *Morton*, 132 N. Y. 556; *Riker* v. *Gwynne*, 129 App. Div. 112; *Ford* v. *Johnston*, 7 Hun, 563; *Cole* v. *Tyler*, 65 N. Y. 73; *First Nat. Bank* v. *Miller*, 163 N. Y. 164; *Sandman* v. *Seaman*, 84 Hun, 337; 156 N. Y. 668; *Morris* v. *Morris*, 71 Hun, 45; *Maasch* v. *Grauer*, 58 App. Div. 560; *Bryan* v. *Baldwin*, 52 N. Y. 232; *Roach* v. *Duckworth*, 95 N. Y. 391.) If defendant-appellant's debt be usurious, then the transfer was entirely voluntary and without any consideration, and is fraudulent as to creditors for that reason. (*Ga Nun* v. *Palmer*, 216 N. Y. 603; *Coleman* v. *Burr*, 93 N. Y. 17; *Wilson* v. *Bajardi*, 10 Fed. Rep. [2d] 922; *Sabine* v. *Paine*, 223 N. Y. 401.) The loan agreements between the defendants were usurious. (*Poel* v. *Brunswick-Balke-Collender Co.*, 216 N. Y. 310; *Hartigan* v. *Casualty Co.*, 227 N. Y. 175; *Matter of Thompson*, 217 N. Y. 111; *Smyth* v. *Brooklyn Union El. R. R. Co.*, 193 N. Y. 335; *Browne* v. *Vredenburgh*, 43 N. Y. 195; *Vilas* v. *McBride*, 62 Hun, 324; 136 N. Y. 634; *Sweet* v. *Spence*, 35 Barb. 44; *Leavitt* v. *De Launy*, 4 N. Y. 364; *Tyng* v. *Commercial Warehouse Co.*, 58 N. Y. 308; *Hungerford Brass Co.* v. *Brigham*, 47 Misc. Rep. 240; *Diehl* v. *Becker*,

227 N. Y. 318; *Webster* v. *Roe*, 212 App. Div. 756; 241 N. Y. 570.) The plaintiffs, as judgment creditors of defendant Winant, have a right to avoid appellant's alleged prior lien by showing it to be usurious. (*Mason* v. *Lord*, 40 N. Y. 476; *Thompson* v. *Van Vechten*, 27 N. Y. 568; *Carow* v. *Kelly*, 59 Barb. 239; *Dix* v. *Van Wyck*, 2 Hill, 522; *Matter of Kendrick*, 107 N. Y. 104; *Hammond* v. *Hudson River Co.*, 20 Barb. 378; *Massachusetts Co.* v. *Cane Creek Township*, 155 U. S. 283; *Wilson* v. *Oswego Township*, 151 U. S. 56; *Brooks* v. *Avery*, 4 N. Y. 225; *Schermerhorn* v. *Talman*, 14 N. Y. 93; *Bullard* v. *Raynor*, 30 N. Y. 197; *Buckingham* v. *Corning*, 91 N. Y. 525; *O'Brien* v. *Ferguson*, 37 Hun, 368; *Bostwick* v. *Menck*, 40 N. Y. 383; *Knapp* v. *Crane*, 14 App. Div. 120; *Lees* v. *Hayden*, 78 Hun, 370; *Comyns* v. *Riker*, 83 Hun, 471; *Railroad Co.* v. *Soutter*, 13 Wall. 517.)

Hubbs, J. The defendant Winant defaulted in paying a bill of exchange for $300,000, held by the plaintiffs. The obligation became due on October 1, 1928. Prior thereto and commencing in May, 1928, Winant and the defendant W. A. Harriman & Co., Inc. (hereinafter referred to as Harriman), had made certain loan agreements whereby $2,600,000 was loaned to Winant and 450,000 shares of stock of the Falcon Oil Corporation were pledged as collateral. The 450,000 shares so pledged represented a substantial majority of the outstanding shares of the Falcon Oil Corporation.

The loan agreement gave to the defendant Harriman full voting rights on the stock and provided that three employees of Harriman should be elected directors. The defendant Harriman, therefore, prior to Winant's default on his obligation to plaintiffs, was in possession of the Falcon stock and in control of the corporation. The last of the loan agreements expired on December 1, 1928. The time of payment was extended for one month. The loan not having been paid on January 9, 1929, Harriman

served a notice on Winant that pursuant to article IX of the Lien Law (Cons. Laws, ch. 33), it would sell the 450,000 shares of Falcon at public auction on February 6, 1929. The notice of sale purported to reserve for Harriman the right to buy at its own sale. On January 25, 1929, the plaintiffs commenced an action to recover upon the bill of exchange. Winant, who is an attorney, appeared personally, admitted the allegations of the complaint and consented to the entry of judgment. Judgment was duly entered on February 1, 1929, and an execution thereon was returned unsatisfied prior to the commencement of this action.

The summons and complaint in the present action, brought to subject to the payment of plaintiffs' said judgment the 450,000 shares of Falcon, were served upon both Harriman and Winant on February 2, 1929. In January, 1929, Winant offered to transfer the Falcon stock to Harriman in satisfaction of his indebtedness but Harriman refused the offer. After the commencement of this action and on February 5, 1929, the plaintiffs advised Harriman that they would make a public announcement at the proposed sale that the purchaser would not obtain good title to the Falcon stock. Winant, having repeated his offer to Harriman, the latter on February 6th, accepted the stock in satisfaction of the indebtedness and the transfer was made on the same date.

In the latter part of February, 1929, the plaintiffs served a supplemental complaint, praying that the transfer be set aside under the Debtor and Creditor Law (Cons. Laws, ch. 12). It is alleged in the original complaint that the loan was usurious because a loan at six per cent interest was coupled with an option agreement permitting Harriman to buy the stock at a specified figure and take forty per cent of possible profits from a proposed deal between Winant and the Venezuelan government. But in their supplemental complaint the plaintiffs alleged that the transfer of the stock to Harri-

man was not for a fair consideration within the meaning of section 272 of the Debtor and Creditor Law. That, therefore, the transfer was in violation of that law.

The trial court resolved the issues in favor of the defendant Harriman. The Appellate Division, two justices dissenting, reversed certain findings of fact and held that the transfer was made in fraud of the plaintiffs within the meaning of the sections of the Debtor and Creditor Law, and directed a money judgment in favor of the plaintiffs for the full amount of their claim. The Appellate Division sustained the trial court's finding that the transaction was not tainted with usury and the serious question presented upon this appeal is whether the Appellate Division was justified in reversing the findings of the trial court to the effect that the transfer of the stock to the defendant Harriman was based upon a fair consideration.

The Debtor and Creditor Law provides as follows:

Section 272: " Fair consideration is given for property, or obligation, (a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."

Section 273: " Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

Section 278: " Where a conveyance * * * is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase * * * (a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim."

The Falcon Oil Corporation had acquired the interest of the Venezuelan National Petroleum Corporation in certain concessions upon some 370,000 acres of oil lands in

Venezuela and East Venezuela. The concessions were entered on the books of the Falcon Oil Corporation at a valuation of $2,000,000, and that corporation gave in exchange for the concessions 200,000 shares of its stock. Subsequently, the Venezuelan National Petroleum Corporation entered into an agreement to purchase from certain individuals the five per cent underlying royalty on oil produced from certain property belonging to the Lago Petroleum Corporation, and to pay therefor $2,700,000 in cash. Thereafter, the royalty was transferred to Falcon Oil Corporation for $1,250,000, payable in cash at the time of the transfer and 335,000 shares of Falcon Oil Corporation stock. The royalty was at first set up on the books of the Falcon Oil Corporation at $4,600,000, making a total property account for concessions and royalty of $6,600,000.

These various transactions occurred during the period from April 1, 1927, to June 30, 1927. In August, 1927, the royalty was by resolution of the board of directors of Falcon written up by an additional $1,175,000. The amount paid to the original owners was $4,050,000, in cash and $175,000 in stock of the Venezuelan National Petroleum Corporation. An additional acreage was purchased by the Falcon Oil Corporation for $50,000. These properties constituted substantially all of the assets of the Falcon Oil Corporation.

In the spring of 1927 Winant had become the principal officer of the Venezuelan National Petroleum Corporation and he subsequently caused the Falcon Oil Corporation to be organized. Winant, acting on behalf of the Venezuelan National Petroleum Corporation, pledged the 200,000 Falcon shares issued for the concessions and the 275,000 shares issued on the royalty contract to obtain the cash needed by the Venezuelan National Petroleum Corporation to pay for the concessions and royalties. In December, 1927, when Harriman first became interested in Falcon affairs, the Falcon Oil Cor-

poration was indebted for a loan of $1,250,000 for which the Falcon royalty, the shares of Falcon stock delivered to the Venezuelan National Petroleum Corporation and Winant's individual credit were pledged. Winant went to Harriman to attempt a plan of financing. *Neither Winant nor the Venezuelan National Petroleum Corporation had placed any funds of their own in the properties.* Harriman refunded the Falcon indebtedness above mentioned by underwriting $1,200,000 of notes of the Falcon Oil Corporation.

Subsequently, Winant disclosed to Harriman that there was a large additional indebtedness and it subsequently became apparent that in order to free the stock from pledges, it would be necessary to raise $1,400,000 over and above the $1,200,000 already underwritten by Harriman. Harriman, after extended negotiations, organized a syndicate which advanced $1,400,000. The syndicate was later reorganized for an additional $1,200,000. Four hundred and fifty thousand shares of Falcon stock were pledged and in addition to the agreement of Winant to pay the defendant Harriman $6,000 as commissions for negotiating the loan, Harriman was given a six months' option to purchase 350,000 shares of Falcon stock at $7.50 a share with a renewal privilege at $9 a share. It was also provided that Harriman was to receive forty per cent of the profits from a new Venezuelan deal that Winant was negotiating. The $2,600,000 was lent under this contract. The debts were paid and the 450,000 shares of stock were turned over to Harriman. After August 29, when the final agreement was made, Harriman continued its efforts to market the stock or the physical properties. The effort was unsuccessful.

There is evidence of efforts, from February, 1929, to August of that year on the part of Harriman to dispose of the Falcon stock or the properties which it represented. In those negotiations Harriman met with an obstacle which grew out of the fact that in the five per cent royalty

contract between Falcon and Lago an option was given to Lago to take the oil in kind from Falcon for the entire life of the property and pay the current market price therefor; that Lago had the right for thirty days to purchase the royalty at the same price offered by a purchaser, and that if there were any increase in the Venezuelan government taxes or royalty, the Falcon royalty would bear the entire burden of the increase. Finally, in August, Harriman, through the efforts of its vice-president in Paris and others, successfully consummated a sale of the royalty to Credito Nacional Peninsular y Americano for $6,600,000, upon condition that Harriman succeed in negotiating a new contract with Lago eliminating the most objectionable clauses. This was finally accomplished upon a payment of $200,000 cash.

The contract with the Spanish company provided for installment payments of $100,000 on August 10, 1929, $150,000 on August 29, 1929, $750,000 on August 30, 1929, $2,800,000 on December 31, 1929, and $2,800,000 on March 31, 1930.

The respondents contend that since Falcon subsequent to the sale had assets aggregating $226,975.20, the sale was equivalent to $9.14 per share upon the 680,000 shares of Falcon stock outstanding. The respondents further contend that the liquidating value of the Falcon stock was $7.63 per share; that Harriman had an investment of $5.98 per share and that it received on the sale a profit of $1.65 per share on its 450,000 shares, making a total excess over the amount it had invested of $742,500. To this they claim should be added commissions claimed by Harriman for a subsidiary, The Petroleum Bond and Share Corporation, totaling $264,000.

There is no other evidence as to a market value for Falcon stock except that subsequent to the sale to the Spanish company, Falcon Oil Corporation purchased 13,627 shares at $5 per share and 14,000 shares at

$6.43 per share. These sales, while certainly indicative of value, were apparently not considered by the Appellate Division.

In determining the value of the stock the Appellate Division considered geological investigations and reports by experts as to the value of physical properties; the value arrived at by capitalizing the company's net earnings on operations up to January 31, 1927; the option prices fixed by the agreements whereby the 450,000 shares were pledged; the price received upon the sale to the Spanish company and book value. It should be borne in mind that the statute which the supplemental complaint alleges to have been violated provides that " Fair consideration is given for property  *  *  *, (a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."

What is fair consideration must, of course, be determined upon the facts and circumstances of each particular case. The Appellate Division has attached considerable importance to the value of the stock as fixed by the sale by Harriman to the Spanish company about six months after the transfer. As bearing upon that element of proof, it should be borne in mind that it was a sale upon credit; that default was made in the payment of early installments, and that an extension of time was required with no proof that the full amount of the contract price will ever be realized. Due to the financial conditions existing it may be that Harriman will never collect the balance. It should further be borne in mind that it was only upon important modifications of an existing contract giving an option to Lago that the sale to the Spanish company was consummated; that it was not known that such modifications could be secured; that the obtaining of those modifications was due to the efforts of Harriman and that previous efforts to obtain such modifications had been unsuccessful. It is further to be borne

in mind that value at the date of the transfer of the stock to Harriman was not necessarily the same value which the stock had at a later date. (*Huntington* v. *Attrill*, 118 N. Y. 365.)

The Appellate Division attached great importance to the option price at which Harriman was permitted to purchase 350,000 shares under the agreement of August 31, 1928. It will be recalled that the contract resulting in the loan and the pledge of the shares provided that Harriman might purchase up to December 31, 1928, at $7.50 per share and at $9 per share within six months thereafter. The Appellate Division said that these prices clearly showed that Harriman, up to a short time prior to the transfer, considered this stock at a minimum value of $7.50 a share. Obviously the price at which a person takes an option, especially under circumstances where he is involved in a highly speculative transaction such as this, is no reliable criterion of value.

The trial court found that the book value was in excess of $10 a share. It does not appear that great importance was attached to that finding. The appellant pointed out, however, that the book value of the Falcon stock resulted in part from arbitrary writing-up of assets and from sales between corporations based upon sale prices in stock of the purchasing corporations which are not indicative of actual values of the properties acquired and are, therefore, unreliable as evidence of the fair value of the Falcon stock.

The appellant contends that the Appellate Division was in error in the finding that the stock had a value of $7.70 a share, arrived at by capitalizing the company's net earnings on operations up to January 31, 1929, on a ten per cent basis and adding thereto $2 a share for undeveloped concession oil lands for which $1,340,000 had been paid in cash and $175,000 in stock. Appellant says that that valuation was arrived at by determining the net profits received by Falcon for all the oil it sold, to wit, $885,424.05, and subtracting therefrom only the overhead computed on the basis of $3,000 per month. Appel-

lant says that this omits depletion and amortization of the $120,000 discount on the $1,200,000 note issue and all interest on the note issue. There is testimony to that effect and there is testimony that for the nineteen months of its operation up to November 1, 1929, the net profits were at the rate of 38 cents per share, which, capitalized at ten per cent, would amount to $3.80, and with $2 per share for the value of the concessions would make a total value of $5.80 per share.

There is the positive testimony of the president of Falcon that the net price received by Falcon for the period from July 1, 1927, to February 1, 1929, from the oil produced, amounted to $885,424.05, which was arrived at by deducting from the purchase price 32½ cents per barrel transportation charges, commissions and the official gauge inspection charge on each delivery of oil. He further testified that the net profit for the period from July 1, 1927, to July 31, 1928, was $212,478.30, and that the profit from August 1, 1928, to January 31, 1929, was $124,339.35, making a total net profit of $336,817.65. He testified also that in computing the net profit, depletion had been figured at the rate of 15 cents per barrel, whereas the Federal examiner for income tax purposes allowed 56.36 per cent. This would make the return on the stock 49 cents per share as against 77 cents found by the Appellate Division, and if the depletion rate allowed by the Federal examiner is to be considered as proper, it is apparent that a net loss would be shown.

The same witness testified that the overhead included salaries, the Maracaibo office and other office rent, telephone and cable charges and amounted to an average of $3,000 a month. The respondents say that their average net income was $46,600 per month. This is one-nineteenth of $885,424.05, the amount of the net price received for the oil. Deducting from that net price $3,000 per month for overhead, which Richards testified included only the specific items mentioned above, leaves a net figure of 77 cents per share, the amount found by

the Appellate Division. It is obvious that this does not take into account depreciation, amortization of the discount on the note issue, and interest on the note issue. It would seem that the Appellate Division erred in its capitalization of net earnings in that it took the net price less a part of the expense instead of net profits as the basis for making the capitalization.

This leaves the geological valuation of the properties as the only important element upon which the findings made by the Appellate Division could be sustained.

This geological report was procured by Falcon not as a basis for investment but as a basis for a sale of the property pursuant to its agreement of August 31, 1928. It was, at best, an estimate. Its accuracy is questioned by other experts produced by the defendant-appellant, and in view of all the other evidence of a lower or at least questionable value, should not be taken as conclusive.

There is considerable evidence that this stock was unmarketable at the date of its transfer to Harriman for any such price as that found to be its value by the Appellate Division; that it was valuable only to the extent that the corporation could be made to pay a profit or a purchaser could be found. There is evidence that the price of oil fluctuated materially and that the profits of the corporation and the marketability of the stock were largely dependent upon the market price of oil. In taking the stock, the defendant Harriman took all the risks, and to say under those circumstances that the price which it paid was not a fair consideration seems to be an improper conclusion.

The respondents contend that the loan in question was usurious upon the grounds heretofore stated.

There is ample evidence that this loan was an incident only in a general plan of refinancing, attempted at the solicitation of Winant by the defendant Harriman. There is testimony that prior to the making of the first loan agreement, negotiations were had between the parties, and that, as a result, Harriman undertook to procure

$1,200,000 to cover a note issue which it had under-written; that it organized a syndicate which took the loan and agreed to take the stock as collateral; that sub-sequently it developed that the Falcon stock was pledged for a much greater amount and that it organized another syndicate to take the additional amount; that it made consistent and repeated efforts to market the properties or the stock.

It is quite clear that its option agreement was obtained to insure itself of ability to produce the stock to fulfill such contract as it might make, and it seems equally apparent that the commissions and agreement relative to profit on an independent deal were collateral to the loan and not intended as compensation therefor.

The matter has been so viewed by the trial court and as well by the Appellate Division, although the Appellate Division has held that Harriman received an excessive consideration for the stock which it obtained and that to that extent it was a fraud upon the plaintiffs, under the statute but not as a matter of fact. Intent is an important element of usury and the only way that this agreement could be held to be usurious would be to find such intent from the letters written by one party and accepted by the other in which the details of the con-ditions of the loan and pledge of the stock were set forth. The activities of the appellant Harriman belie the contention that its position was no more than a lender.

Even if it were possible upon the evidence to find that this loan was usurious, the plaintiffs, as judgment creditors, are not entitled to attack the validity of the loan.

It was formerly the rule that not even the borrower could come into equity and secure cancellation of a usuri-ous transaction without paying or offering to pay the lender the sum advanced by the latter with legal interest. (*Marsh* v. *House*, 13 Hun, 126.)

This rule has been modified by statute in behalf of the borrower. (General Business Law; Cons. Laws, ch. 20, § 377.)

It has been further provided by statute that a cause of action to cancel a security for a usurious loan may be transferred where the agreement "creates a specific charge upon property, which is also transferred in disaffirmance thereof, and not otherwise; but, in that case, the transferee does not succeed to the right, conferred by statute upon the borrower, to procure relief, *without paying, or offering to pay, any part of the sum or thing loaned.*" (General Business Law, § 375.)

The courts have given a strict construction to the word "borrower." In *Mason* v. *Lord* (40 N. Y. 476) the plaintiff, claiming title in fee as purchaser under an execution issued on his judgment, brought an action of ejectment against the defendant who was in possession as purchaser of a leasehold under a usurious mortgage given by the judgment debtor. It was there held that the action could be maintained without making a tender or offering to pay the indebtedness. *That was an action at law, not in equity.* In *Merchants' Exchange Nat. Bank* v. *Commercial Warehouse Co.* (49 N. Y. 635) the plaintiffs were permitted to bring an action *at law* in conversion without such a tender. In *Post* v. *Bank of Utica* (7 Hill, 391) judgment creditors who had purchased property on an execution sale filed a bill in chancery to set aside a usurious mortgage given by the judgment debtor or have it declared subsequent to the lien of their judgment, but without offering to pay the loan. There a demurrer was sustained and the complaint dismissed. The court said, "Had the legislature, which was composed of sound practical men, intended to have included judgment creditors in the provision in question, they would doubtless have said so expressly" (p. 396).

In *Wheelock* v. *Lee* (64 N. Y. 242) it was held that an assignee in bankruptcy of a borrower could maintain an action to recover the excessive interest upon a usurious loan, but the right so to do did not accrue until after the loan with legal interest had been paid.

It has been held that a devisee of land could not impeach

a usurious mortgage without a tender of the principal. (*Buckingham* v. *Corning*, 91 N. Y. 525.)

In *Union Dime Savings Institution* v. *Wilmot* (94 N. Y. 221) it was said that the law in this State authorizes a subsequent lien holder by mortgage or judgment or mechanic's lien to avail himself of the *defense* of usury against a prior mortgage. But that was as to real property as to which a judgment would constitute a lien.

In *Rice* v. *Schneck* (189 App. Div. 877; affd., 228 N. Y. 561) it was held that a receiver in bankruptcy did not take the immunity given to the borrower in an action to recover securities pledged for a usurious loan without a tender of the amount of the debt. It is quite clear that subsequent lien holders may *defend* an action brought on the alleged usurious contract and set up the defense which would be available to the borrower, and that while a borrower may bring an action to set aside the usurious agreement, a cause of action can only be transferred where a specific charge upon property has been created and the property is transferred in disaffirmance thereof, in which case the transferee does not succeed to the right conferred by statute upon the borrower to procure relief without paying any part of the sum or thing borrowed.

No case is cited nor has one been found where a judgment creditor, not having by sale acquired a lien upon property transferred or attempted to be transferred, has been permitted in a court of equity to have a prior lien set aside on the ground of usury without the payment of the legal amount due.

In the instant case the plaintiffs had no lien on the specific property transferred except such equitable lien as resulted from the institution of this action. The defendant Harriman was a pledgee in possession and had a lien irrespective of the transfer sought to be set aside. If the transfer were to be set aside, the lien of Harriman as pledgee would still exist. The plaintiffs are seeking equitable relief without an offer on their part to do equity.

*Thompson* v. *Van Vechten* (27 N. Y. 568) was an action brought by the holder of a usurious chattel mortgage seeking injunctive relief for the appointment of a receiver and for payment into court for distribution. The defendants were lien holders under mortgages and executions on judgments. It was held that the plaintiff could not use his usurious mortgage to attack their liens.

With the exception of *Thompson* v. *Van Vechten,* these cases are all actions at law, and in that case the plaintiff was seeking to enforce his usurious contract against lien holders.

In *Post* v. *Bank of Utica* (*supra*) it was distinctly held that the purpose of the statute was· to protect the borrower and that the borrower's right is personal to him and cannot be asserted by a stranger to the transaction; that the law was made to prevent oppression and to rescue the party oppressed. It is said: " What has the grantee of the borrower to do with the original contract of loan? How is he liable upon that contract to pay the money borrowed? What connection in law exists between the lender of the money, and a purchaser of the mortgaged premises from the mortgagor? * * * How are the respondents to be connected with a loan made four years before they recovered their judgment * * *?" (p. 405).

It seems to us that reasoning applies to the instant case. The statute is not designed to permit third parties to prefer their claims over the just indebtedness of a person who in connection with that indebtedness has made a usurious contract. It is designed to permit the borrower and those liable on the borrower's debt to avoid the obligation of the usurious contract. (*Buckingham* v. *Corning,* 91 N. Y. 525.)

If the plaintiffs, under their judgment, had caused the property to be sold, it is quite clear that the defendant Harriman, assuming its contract to have been usurious, could not have sustained an action for conversion of the property. It could not have used the usurious contract

as a weapon to defeat the right of one who had acquired a lien or title.

That is substantially the situation of the plaintiff in each of the cases cited by the respondents. Here, no lien having been acquired by the plaintiffs, they cannot be held to be in the position of the borrower.

A very interesting summary of the authorities upon the question as to who can avail himself of the plea of usury is to be found in the opinion of JONES, J., at Special Term, in *Merchants' Exchange Nat. Bank* v. *Commercial Warehouse Co.* (reprinted in 49 N. Y. at p. 642).

A note in 17 A. L. R. (pp. 130 and 131), referring to the New York rule, states that the courts have given the word "borrower," as used in this State, a strict construction and have held that any person other than the party bound by the original contract to pay the loan, is obliged to tender the principal of the debt and legal interest thereon as a condition of equitable relief against a usurious loan, and cites authorities showing the application of the principle to a subsequent mortgagee; to the original mortgagor, having lost his status as borrower by selling the equity of redemption; a surety of the principal debtor; assignee in bankruptcy of the borrower; heir or devisee of the borrower; grantee of a mortgagor; subsequent lienor; assignee for creditors, and trustee in bankruptcy.

In *Hubbard* v. *Tod* (171 U. S. 474) a situation somewhat similar to that involved in the instant case was presented. The respondent was pledgee of certain shares of stock. A trust company claiming a prior right to have the stock pledged to it, sought to set aside a transfer, and the court said, " it was petitioner who sought the affirmative aid of equity which he could only obtain by doing equity " (p. 502).

The opinion refers to the New York statute and states that the act has been rigidly confined to the borrower himself, citing: *Wheelock* v. *Lee* (*supra*); *Buckingham* v. *Corning* (*supra*); *Allerton* v. *Belden* (49 N. Y. 373).

We feel that the result reached by the trial court was right upon the merits; that, under all of the circumstances, the consideration paid by Harriman was a fair consideration, a fair equivalent for the stock, and that the contract was made in good faith. Winant and the Venezuelan National had not invested a cent of their own money. The whole transaction was an extremely hazardous one, involving oil concessions in a foreign country; concededly no one could be found who would pay more. After diligent effort to sell the highest price offered was $4 a share. Even after the Spanish contract had been consummated, the only two sales made of the stock were a block of 13,625 shares at $5 a share and another block at $6.43, or an average of $5.72½, which was less than Harriman paid. The wide difference in the price at which those two blocks of stock were sold indicates the uncertainty existing at the time as to the real value of the stock. To hold, long after the transaction, upon the grounds advanced, that the transaction was fraudulent under the statute seems to us to disregard the realities and substitute therefor pure speculation.

The question of usury was properly decided by the trial court and Appellate Division. There was no usurious intent found and the plaintiff was seeking equity without an offer to do equity. The defense of usury is personal to the borrower, and in any event it could not recover without a tender of payment to Harriman of the legal amount due.

The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs in this court and in the Appellate Division.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgment accordingly.