UNITED STATES of America,
Petitioner,

v.

Eduardo OROZCO–PRADA; Mrs. Eduardo Orozco-Prada; Victor Ballestas; Victor Ballestas, Inc., Pamilar Homes, Inc.; Schultz Management; Samuel G. Cooper; European American Bank and Trust Company; Nassau Trust Company; Herbert Gallagher, Esq.; Morrison, Paul & Beiley, P.C.; Jerome Krinsky, Respondents.

No. 82 Cr. 811 (GLG).

United States District Court,
S.D. New York.

June 16, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for petitioner; Beverly Sherman Nash, Gerald T. Ford, of counsel.

Marcelo Curi, Flushing, N.Y., for respondent Victor Ballestas; Theodore Gilbert, of counsel.

Isaac Anolic, P.C., New York City, for respondents Schultz Management and Samuel G. Cooper.

Morrison, Cohen & Singer, by Malcolm I. Lewin, Kevin T. Rover, Alan E. Sorcher, New York City, for respondent Morrison, Paul & Beiley, P.C.

## OPINION

GOETTEL, District Judge.

Before this Court are applications by several parties claiming an interest in property once owned by defendant Eduardo Orozco-Prada ("Orozco"). The Government asserts a lien on the property to satisfy the substantial criminal fine levied against Orozco. The other claimants allege interests in the property based upon either an antecedent debt or a subsequent purchase for value. As discussed below, we find that the initial conveyance of the property by Orozco was fraudulent and that the subsequent claimants should have been on notice of that fraud. Accordingly, the United States is entitled to a priority interest in the property.

## I. *Background*

In November 1982, Orozco was arrested and charged with seven counts of, *inter alia,* drug conspiracy and money laundering. After a lengthy trial in spring 1983, Orozco was convicted on six of the seven counts against him. Three of his four co-defendants were also convicted, albeit each on only one count. On June 30, 1983, two co-defendants were sentenced to periods of imprisonment, and one was fined $5,000. On July 6, 1983, the third convicted co-defendant was sentenced to a period of imprisonment and fined $25,000. On July 13, 1983, prior to Orozco's sentencing, but after his co-defendants had been sentenced and fined, Orozco assigned his right to purchase a piece of property at 11 Trusdale Drive, Old Westbury, New York (the

"Westbury property") to Victor Ballestas. Orozco was sentenced on September 7, 1983, to a period of eight years imprisonment, and fined $1,035,000.[1]

In 1981, Orozco had contracted with Pamilar Homes, Inc. ("Pamilar") to build a house on the Westbury property. Orozco and his family began residing at the Westbury property some time in 1982. Between March 1981 and November 16, 1982, the date of his arrest, Orozco paid Pamilar $532,000 towards the price of the house. In conveying his rights to purchase the property to Ballestas in July 1983, Orozco received no consideration, even though he had already paid over a half million dollars to the builder. On August 25, 1983, Ballestas closed title on the Westbury property and executed a $137,300 first mortgage to Pamilar. That mortgage was recorded on October 31, 1983. Orozco and his family remained in possession of the Westbury property until summer 1984.

Meanwhile, on September 15, and October 7, 1983, this Court held hearings regarding Orozco's ability to pay the fine assessed against him. At those hearings, the issue of the ownership of the Westbury property was extensively discussed, since it was the major asset with which Orozco could pay his fine. Orozco attended several days of those hearings, but never disclosed to the Court that he had assigned his rights in the property to Ballestas. The assignment left him without sufficient assets to pay his criminal fine. On October 7, this Court directed Orozco to assign his interest in the property to the United States as security for his fine. This Court issued a written order on November 16, 1983, stating that Orozco had a "substantial equitable interest" in the Westbury property to which the fine could attach. That order was filed in Nassau County on November 23, 1983.

On November 10, 1983, before the above-noted order was issued and filed, Ballestas executed two notes and second mortgages on the Westbury property. One was for

---

1. On appeal, the Second Circuit reduced the period of imprisonment from eight to five years. The fine was unchanged.

$250,000 to Schultz Management ("Schultz") and the other for $20,000 to Samuel Cooper ("Cooper"). Both loans were at a purported interest rate of twenty-four percent per annum. These mortgages were recorded on November 21, 1983, two days before the November 16th order was recorded in Nassau County.

On July 12, 1984, Schultz commenced foreclosure proceedings on the Westbury property because the second mortgage was in default. In October 1984, the Government moved to stay the foreclosure proceedings in state court, and to set aside Orozco's assignment of his property rights to Ballestas as a fraudulent conveyance. Ballestas moved for an order approving his sale of the property to a third party. In November 1984, this Court issued an order enjoining the state court foreclosure actions. In December 1984, we issued a supplemental order allowing Ballestas to sell the property to a third party for $820,000. From these proceeds, various property taxes, mechanics' liens, broker and legal fees, and the first mortgage were to be paid. The remaining balance, about $551,771, was to be put in an interest-bearing account. The order further directed discovery and an evidentiary hearing on the issue of priority of interests in the property and the alleged fraudulent conveyance.

This Court held extensive evidentiary hearings in February and March 1986 on the various claims to the Westbury property.[2] Mrs. Orozco testified that, although she and her husband had jointly contracted for the house and had lived there with their family, her relatives in Columbia and their business interests had actually purchased the house on speculation. Mrs. Orozco noted that most of the payments to the builder came from an account maintained in her name, which had been opened for the primary purpose of paying for the house. She acknowledged, however, that most of the deposits to that account came from her husband. Still, she claimed that her family had sent the money through her husband as a matter of convenience.

Ballestas testified that he had been owed money for years by Mrs. Orozco's family in Columbia and their business interests, and that he accepted the house in payment of that antecedent debt. We must first determine whether the conveyance to Ballestras was valid or fraudulent, and, if fraudulent, whether it tainted the second mortgages on the property held by Schultz and Cooper.

## II. *Discussion*

### A. *Ballestas's Claim*

▮ It is undisputed that New York law governs this case. The United States, as the defrauded creditor, has the initial burden of establishing that the conveyance of the Westbury property from Orozco to Ballestas was fraudulent within the meaning of sections 273, 275, or 276 of the New York Debtor and Creditor Law.[3] *Flierl v. Hickey*, 24 N.Y.S.2d 573, 575 (Erie Co.Sup. Ct.1941). The Government need not show

---

2. In addition to claims asserted by the United States, Ballestas, Schultz, and Cooper, Orozco's trial counsel asserted an attorney's lien for services rendered prior to entry of the judgment of conviction and imposition of the fine. On March 4, 1986, we were advised that Orozco's attorneys and the United States had reached a settlement regarding their respective claims. Accordingly, no further testimony was heard on that issue. On June 13, 1986, the United States Attorney's office advised the Court that the settlement had collapsed and further hearings might be necessary. Since we must determine the Government's rights as against each of the other claimants, this decision shall address only the claims by Ballestas, Schultz, and Cooper. We will consider the question of the attorneys' claim at a later date.

3. Under New York's Debtor and Creditor Law, a conveyance of property will be considered fraudulent in several circumstances.

§ 273. Conveyances by insolvent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

§ 275. Conveyances by a person about to incur debts

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

actual intent to defraud creditors. If, regardless of intent to defraud, the transferor failed to receive fair consideration for the conveyance and was, thereby, rendered insolvent, section 273 raises a presumption that the conveyance was fraudulent. *Feist v. Druckerman,* 70 F.2d 333, 334 (2d Cir. 1934). "Fair consideration" may consist of an exchange for fairly equivalent property, "or an antecedent debt in amount not disproportionately small as compared with the value of the property." N.Y.Debt. & Cred.Law § 272 (McKinney 1945).

■ Ballestas asserts that the antecedent debt owed him by Mrs. Orozco's family was "fair consideration" for the transfer. We cannot agree. Although Ballestas may have had some business dealings with Mrs. Orozco's family in Columbia, the evidence adduced regarding the purchase of the house by Orozco, the bank accounts, and the payments, convince us that Ballestas's claim of an antecedent debt is a sham, and that no consideration was given for the transfer to Ballestas of Orozco's rights in the Westbury property. Since the conveyance apparently rendered Orozco insolvent,[4] the presumption arises under section 273 that the conveyance was fraudulent, and imposes on the voluntary transferee the duty of going forward with proof of the transferor's solvency to prevent the conveyance from being set aside. *Feist v. Druckerman, supra,* 70 F.2d at 335. Ballestas did not present proof of Orozco's solvency. Thus, pursuant to section 273, the conveyance to him must be deemed fraudulent.

■ We reach the same conclusion under section 275 of the Debtor and Creditor Law, which deems fraudulent a conveyance made "without fair consideration when the person making the conveyance . . . believes that he will incur debts beyond his ability to pay." N.Y.Debt. & Cred.Law § 275 (McKinney 1945). Orozco assigned his rights to Ballestas prior to being sentenced, but subsequent to the sentencing of his co-defendants, all of whom were convicted of fewer counts and lesser offenses, but who nevertheless received substantial sentences and fines. Furthermore, the transfer was made for no consideration at all. Under these circumstances, we find that the conveyance to Ballestas was fraudulent within the meaning of section 275.

■ Finally, the evidence also indicates a fraudulent intent by Orozco to put the Westbury property out of reach of the Government in expectation of a substantial criminal penalty. Proof of actual fraudulent intent makes a *prima facie* case and shifts to the grantee the burden of establishing his good faith in the transfer. *Sabatino v. Cannizzaro,* 243 A.D. 20, 275 N.Y.S. 677, 679 (1st Dep't 1934). The fact that the conveyance was voluntary, without consideration, and rendered Orozco unable to pay his debts, gives rise to the presumption that the conveyance was made to defraud creditors. *Id.* "If the grantor made the conveyance with fraudulent intent, the burden was on the grantee to show that he had accepted it for value, in which event the [creditors] might have had to prove that he had notice of the fraud." *Brody v. Pecoraro,* 250 N.Y. 56, 61–62, 164 N.E. 741 (1928) (Cardozo, J.). As we have already noted, Ballestas gave no valuable consideration for the conveyance.

In sum, we find Orozco's conveyance of the Westbury property to Ballestas was fraudulent within the meaning of sections 273, 275, and 276, of the Debtor and Creditor Law. Accordingly, it may be set aside by Orozco's creditor, the United States, pursuant to section 278 of the Debtor and Creditor Law.[5] *See Berlenbach v. Bis-*

---

§ 276. Conveyance made with intent to defraud

    Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y.Debt. & Cred.Law §§ 273, 275, & 276 (McKinney 1945).

4. Orozco's many other assets had been seized by the Government as fruits of illegal transactions. The numerous foreclosure proceedings are still pending.

5. Section 278 provides as follows:

*choff,* 137 Misc. 719, 244 N.Y.S. 369, 370 (Kings Co.Sup.Ct.), *aff'd,* 231 A.D. 734, 245 N.Y.S. 744 (2d Dep't 1930).

### B. *Schultz and Cooper's Claims*

Schultz and Cooper contend that they paid fair consideration to Ballestas for the second mortgages on the Westbury property and were unaware of the fraudulent transfer from Orozco to Ballestas. If true, these two factors would exempt them from the Government's right under section 278 of the Debtor and Creditor Law to have the fraudulent conveyance set aside to satisfy its claim. *See supra* note 5.

### 1. Burden of Proof

The threshold issue before us on the claims of Schultz and Cooper is who has the burden of proving or disproving the *bona fide* purchaser status claimed by these two parties. Schultz and Cooper assert that the Government must show that they had either an intent to defraud or notice of the prior fraudulent conveyance to Ballestas. However, the parties have failed to present, and the Court has been unable to locate, any New York cases that address the precise question of the burden of proof in conveyances from fraudulent grantees to alleged *bona fide* purchasers. The statute at issue is New York's codification of the Uniform Fraudulent Conveyance Act, which a number of other states have also adopted. Hence, we find it appropriate to look to these other jurisdictions to see how they have interpreted their fraudulent conveyance statutes in situations analogous to the instant facts.

A section of the Pennsylvania Uniform Fraudulent Conveyance Act, 39 Pa. Stat. § 359(1), is identical to section 278 of the New York Debtor and Creditor Law,

> 1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser.

*see supra* note 4. The Pennsylvania Supreme Court has noted:

> A bona fide purchaser from a fraudulent grantee is protected against the equities of third persons not arising out of the instrument, a bona fide purchaser being understood to be one who gives consideration and takes without either actual or constructive notice of the rights of others in the property.... [T]he burden was upon [the subsequent purchasers] to establish not only that they did not know that the [earlier] bonds and mortgages had been executed by [the original grantor] without any consideration, but also that there was nothing to put them on inquiry as to that fact; this burden they made no attempt to meet.

*Cancilla v. Bondy,* 353 Pa. 249, 44 A.2d 586, 588 (1945) (footnote omitted). This rule of placing the burden of proof on a subsequent purchaser to establish his *bona fide* status was reiterated in *United States v. Gleneagles Investment Co.,* 571 F.Supp. 935, 951 (M.D.Pa.1983). *Accord United States v. West,* 299 F.Supp. 661, 667 (D.Del. 1969) ("It is incumbent upon the [purchaser from a fraudulent grantee] to satisfy the court that he was a bona fide purchaser for value without either actual or constructive notice of the fraud.").

We agree with this evidentiary burden. Thus, in the instant case, the burden of proof rests with Schultz and Cooper to establish that, indeed, they were *bona fide* purchasers for valuable consideration and had neither actual nor constructive knowledge that the conveyance from Orozco to Ballestas was fraudulent.

### 2. *Bona Fide* Purchaser Status

#### a. Valuable Consideration

It is undeniable that Schultz and Cooper paid valuable consideration for the second mortgages on the Westbury property. Schultz loaned Ballestas $250,000, secured by a mortgage on the Westbury property.[6]

> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
> b. Disregard the conveyance and attach or levy execution upon the property conveyed.
> N.Y.Debt. & Cred.Law § 278 (McKinney 1945).

6. The loan was apparently made to Ballestas's corporation, Victor Ballestas, Inc., and guaranteed by Ballestas individually executing a sec-

To induce Schultz to make this loan, Cooper agreed to guarantee it. In exchange for this guarantee, Ballestas executed a mortgage in favor of Cooper for $20,000, also secured by the Westbury property. In addition, Ballestas paid Cooper a "finder's fee" of $17,500 for arranging the Schultz loan. Both loans were at a purported interest rate of twenty-four percent per annum.[7]

The terms of each loan were particularly advantageous to the lender. These terms evince a "lender of last resort" who is willing to lend to those willing to pay a twenty-four percent (or more) interest rate in order to obtain rush financing with few, if any, questions asked. No doubt such an extraordinary interest rate and accompanying fees were warranted if Ballestas was in trouble, or there was a problem with the Westbury property. An expedient *bona fide* purchaser should have made some inquiries as to why the borrower was willing to pay such high interest on secured loans. No inquiry was made and, thus, the terms of these loans are noted by this Court as a specter raised and ignored.

### b. Actual or Constructive Knowledge

Schultz and Cooper contend that they had no actual knowledge of any earlier conveyance from Orozco to Ballestas. They assert that they are entitled to rely on the title insurance report,[8] which stated neither that Orozco had been the prior owner of the Westbury property nor that the United States had any claims on the property.[9] However, although a title report may demonstrate a grantee's actual knowledge of the facts contained therein, it is not dispositive of the grantee's constructive or inquiry knowledge about an earlier conveyance. A person must use ordinary thoughtfulness and make accessible inquiries. If he does not, and avoids the inquiry, he is chargeable with the knowledge which ordinary diligence would have elicited, and cannot be considered a *bona fide* purchaser. *See Fidelity & Deposit Co. of Maryland v. Queens County Trust Co.*, 226 N.Y. 225, 233, 123 N.E. 370 (1919); *Williamson v. Brown*, 15 N.Y. 354, 362 (1857); *Morse v. Howard Park Corp.*, 50 Misc.2d 834, 272 N.Y.S.2d 16, 23 (Queens Co.Sup.Ct.1966).

When Cooper went to inspect the Westbury property, he was greeted by Orozco's son, who so identified himself. Cooper and Schultz failed to ask the obvious questions—why are you living here, where is Ballestas, and why isn't he living in the house. Furthermore, in seeking the second

---

ond mortgage on the Westbury property in favor of Schultz.

7. An argument has been made that, under the "true interest rate" formula, the actual interest was 28.3 percent. *See Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 446 N.Y.S.2d 917, 925 n. 5, 431 N.E.2d 278, 286 n. 5 (1981). Under the *Hammelburger* test, whether or not a "commission" or "guarantee fee" is a cover for usury is question of fact. Thus, if Cooper's fee was a "finder's fee," and if the $17,500 is allocated one-third to each of the three years of the loan, the additional interest would really be $5,833. The total interest, then, for the first year would be $65,833. The interest rate, therefore, calculated on the entire $250,000, yields a true rate of interest of 28.3 percent.

Under section 190.40 of the New York Penal Code, this loan would be usurious and void under section 5–511 of the New York General Obligations Law. N.Y.Gen.Oblig.Law § 5–511 (McKinney 1978). *See Szerdahelyi v. Harris*, 67 N.Y.2d 42, 499 N.Y.S.2d 650, 653–54, 490 N.E.2d 517, 520–21 (1986); *Hammelburger, supra*, 446 N.Y.S.2d at 922, 431 N.E.2d at 283. However,

we do not reach this issue, since the defense of usury is personal to the borrower, and may not be raised by a judgment creditor or any other person not in privity with the mortgagor. *See Halsey v. Winant*, 258 N.Y. 512, 530, 180 N.E. 253 (1932); *Barrett v. Conley*, 35 Misc.2d 47, 228 N.Y.S.2d 992 (Erie Co.Sup.Ct.1962).

8. Indeed, at the evidentiary hearing earlier this year, Schultz and Cooper made no attempt to rebut the Government's case, and merely offered documentary evidence of what was contained in the title report for the second mortgages.

9. The Court's order declaring the United States' interest in the property was recorded in Nassau County two days after Schultz and Cooper recorded their second mortgages on the Westbury property. Schultz and Cooper rely on this fact, claiming that their interests must prevail over a prior unrecorded interest pursuant to New York's recording statute. N.Y. Real Prop. § 291 (McKinney 1968). Were Schultz and Cooper *"bona fide"* purchases, we might agree. However, as discussed *infra*, we find they were not.

mortgages from Schultz and Cooper, Ballestas submitted documents indicating that his home was in Miami, Florida. This alone should have raised some questions. Thereafter, when Cooper's visit to the Westbury property revealed that the actual tenancy was inconsistent with record ownership, Cooper still made no inquiries. He testified, "I don't care who is occupying [the house]. It has nothing to do with the title." Transcript, March 4, 1986, at 44 (hereafter "3/4/86 Tr."). Despite Cooper's cavalier attitude, this open and visible possession by third persons placed Cooper and Schultz on constructive notice of the possible existence of prior rights of others. *See In Re Euro-Swiss International Corp.*, 33 B.R. 872, 882 (Bankr.S.D.N.Y.1983); *In re Hardway Restaurant, Inc.*, 31 B.R. 322, 329 (Bankr.S.D.N.Y.1983); *Sanzone v. Niagara Mohawk Power Corp.*, 47 Misc.2d 237, 262 N.Y.S.2d 138 (Sup.Ct.Oneida Co. 1965), *aff'd*, 27 A.D.2d 646, 277 N.Y.S.2d 125 (4th Dep't 1966).

The title report indicated that there were six outstanding liens on the property. Two mechanics' liens named Orozco as the individual for whom work had been performed. One lien, dated November 22, 1982, filed by Alley Pond Nurseries Huntington, Inc. in the amount of $36,131.80, refers to Orozco and his wife as follows:

■ The name of the person by whom the lienor was employed is Eduardo Orozco & Mercedes Orozco.

■ The name of the person to whom the lienor furnished or is to furnish materials or for whom the lienor performed or is to perform professional services is Pamilar Homes, Inc. and Eduardo Orozco and Mercedes Orozco.

■ The name of the person with whom the contract is made is Eduardo and Mercedes Orozco.

The other mechanics' lien was filed by Louis Zaino, Inc. for $4,750 in December 1982. It names only Orozco as follows:

■ The name of the person by whom the lienor was employed is Eduardo Orozco.

■ The name of the person to whom the lienor furnished or is to furnish materials or for whom the lienor performed or is to perform professional services is Eduardo Orozco.

■ The name of the person with whom the contract is made is Eduardo Orozco.

■ The name of the person for whom professional services were rendered is Eduardo Orozco.

These liens, on their face, demanded some inquiry.

The mechanics' liens were of "major concern" to Cooper.[10] 3/4/86 Tr. at 46. At the closing, four hours were spent discussing them. Orozco was present at the closing and purportedly explained the liens to Cooper's satisfaction. Although Schultz and Cooper assert that Orozco was at the closing solely to act as Ballestas's interpreter, another witness testified that Orozco had the information about the liens and responded directly to Cooper's questions without consulting with Ballestas. 3/4/86 Tr. at 77.

■ Again, numerous factors such as Orozco's name on the liens, his presence at the closing, and his explanation about the liens, should have alerted Cooper that something was amiss. Cooper and Schultz are "chargeable with notice, by implication, of every fact affecting the title, which would be discovered by an examination of the deeds or other muniment of title of his vendor, and of every fact, as to which the purchaser, with reasonable prudence or diligence, ought to become acquainted." *Cambridge Valley Bank v. Delno*, 48 N.Y. 326, 336 (1872). The facts in the instant case belie Schultz and Cooper's assertion that they were without notice of the earlier fraudulent conveyance. Schultz and Cooper ignored warning signs which should have put them on notice that something

---

**10.** Cooper contends that his concern was merely financial, because the mechanics' liens impacted on the security of the mortgage. However, in reviewing the facts surrounding the execution of the loan to Ballestas, it is curious that Cooper made no inquiries when Orozco's name appeared on two mechanics' liens, and only Orozco came forward to explain them.

was awry and that a further inquiry would be prudent.

## III. *Conclusion*

The conveyance of the Westbury property from Orozco to Ballestas, for no consideration, was fraudulent and may be set aside by the United States as against all subsequent transferees except one who gave valuable consideration without knowledge of the prior fraudulent conveyance. Schultz and Cooper have failed to carry their burden of proving that they gave second mortgages to Ballestas without knowledge, actual or constructive, of a prior fraudulent conveyance. Their steadfast reliance on the title report is misplaced, since they failed to inquire into any of the warning flags raised in either the title report or the open possession of the property by Orozco and his family. Schultz and Cooper's ostrich-like behavior will not permit them to prevail in this action. They were not innocent purchasers for valuable consideration. Hence, under the New York Debtor and Creditor Law, their claims on the Westbury property must be set aside in favor of the United States.

SO ORDERED.