**In the Matter of REGO CRESCENT CORP., Debtor.**

**REGO CRESCENT CORP., debtor-in-possession, by its Unsecured Creditors Committee, Plaintiff,**

v.

**Rose TYMON and I. Louis Winokur, as Trustees of the Philip Tymon Trust, and Philip Tymon, individually, Defendants.**

**Bankruptcy No. 179–03854.**
**Adv. No. 181–0635.**

United States Bankruptcy Court, E.D. New York.

Oct. 19, 1982.

Glass & Howard, P.C. by Amos Alter, New York City, for plaintiff.

I. Louis Winokur, Jamaica, N.Y., for defendants.

MANUEL J. PRICE, Bankruptcy Judge.

This is an adversary proceeding arising under sections 510(c) and .544(b) of the Bankruptcy Reform Act of 1978, (the Code), 11 U.S.C. §§ 510(c) and 544(b), brought by the Unsecured Creditors' Committee (the Committee) of Rego Crescent Corp. (the Debtor or Rego Crescent) seeking to subordinate the claim of the son of the two stockholders of the debtor corporation and the claim of a trust established for his benefit by them. The Committee also seeks to recover the difference between the consideration received and the value of property conveyed from the debtor to the trust on the ground that the transfer was fraudulent.

These are the facts:

An involuntary petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 303, was filed against Rego Crescent on December 11, 1979, and it responded by filing its own petition under Chapter 11 on December 19, 1979. (Tr., p. 9) The debtor had been involved in diverse investments in real estate—building, renting, and selling both residential and commercial property. Indeed, one of the two shareholders of the corporation described it as a "real estate department store." (Tr., p. 11)

Rose Tymon (Rose) and the late Edward Tymon (Edward), who died in 1980 after the filing of the bankruptcy petitions referred to above and who, along with Rose, also filed a chapter 11 petition, each owned fifty per cent of the shares of the debtor corporation (Tr., pp. 10–11) and served as its officers and directors, (Tr., p. 17). Although the record does not contain the precise date of Rego Crescent's incorporation, it was formed no later than 1949. (Tr., p. 11) Philip Tymon, (Philip) the only child of the stockholders, was born in 1950, after the corporation was formed. (*Id.*)

On January 6, 1960, Edward and Rose Tymon established a trust for the benefit of their son, Philip, naming themselves as trustees together with I. Louis Winokur, (Tr., p. 10), who also served as the attorney

for Rego Crescent. From June 21, 1968 to December 15, 1980, monies passed from the Philip Tymon Trust (the Trust) to Rego Crescent via checks drawn on the Trust. The corporate records of the debtor reflect an obligation to pay 8½ per cent interest on these monies. (Tr., p. 19) These funds have been characterized as loans, although Rose Tymon claimed that the money should not be thought of so much as loans but as part of an investment program wherein the money would be transferred to Rego Crescent from the Trust for the purchase of land by it which would then be conveyed to the Trust.

In a deposition by Rose Tymon read into the record she stated, "[T]hese are not actually loans. In a trust fund we always had to invest the money for something for an income, since the trust fund was for an educational purpose. So we were putting the money into Rego Crescent and we knew that we would buy a piece of property with it, but we had to buy something with an income." (Tr., p. 16) Whatever precise language one chooses to describe these transactions, it is clear to me that these were monies transferred to Rego Crescent with the intention that the principal and interest would be returned to the "lender," either directly or through property. I shall therefore refer to these transactions as loans.

On June 28, 1974, when the Trust had transferred $233,700 to Rego Crescent, it conveyed a parcel of improved real estate located on Woodhaven Boulevard in Queens County, New York, to the Trust. The closing statement indicates that the price for the property was $310,000, which plaintiff has conceded was a fair one. (Tr., p. 20) Consideration for the property came from two sources: the Trust took the property subject to a $97,383.74 mortgage, and the balance of the price, $212,616.26, was paid for by forgiveness of loans which the Trust had made to the debtor. Although the forgiveness of loans was noted neither on the books of Rego Crescent (Plaintiff's Exhibit 4, Tr., p. 50), nor on the initial proof of claim filed by Rose Tymon and I. Louis Winokur, the remaining trustees of the Trust, (Plaintiff's Exhibit 4) it was noted on the records of the Trust and the deed recorded on December 30, 1974 shows that the seller paid transfer taxes of $252.45, (Tr., pp. 59–60) which reflect that the seller considered the sum to have been received. Moreover, in the deposition of Rose Tymon read into evidence she testified, "the trust fund bought the building at 67–33 Woodhaven Boulevard for the money that it had in this account." (Tr., p. 16) For those reasons, I believe that when the Woodhaven Boulevard property was transferred, the parties understood there was to be a setoff of $212,616.26 on Rego Crescent's books.

In an attempt to prove that Rego Crescent was insolvent at the time of the transfer, the Committee put into evidence an unaudited balance sheet of the debtor as of June 30, 1974, two days after the conveyance, that was prepared for the Committee by the accounting firm, Main Hurdman, (Plaintiff's Exhibit 7) The balance sheet shows a capital deficiency of $78,811. *Id.* Total assets of the corporation are $8,146,-731. *Id.* The major asset of the corporation, its real estate, is reflected on the balance sheet as "Real estate—net $6,996,452." George M. Carras (Carras), a partner in Main Hurdman who supervised the preparation of the balance sheet, (Tr., pp. 41–43) testified that the value of the real estate was computed, in accordance with accepted accounting principles, by taking the actual cost of the property, adding the cost of improvements to the property to the extent that there were any, and deducting from that figure depreciation on the properties. (Tr., p. 44, p. 46) No attempt was made to obtain any appraisal of the market value of the property on that date, (Tr., p. 44) even though, as Carras admitted, there could be a great deal of difference between its actual value and its book value. *Id.* Indeed, no evidence was proffered showing the individual actual costs of the properties and the dates that they were purchased.

After the building was conveyed to the Trust, the Trust continued to advance monies to the debtor. From October, 1974, to December, 1978, those loans totalled $82,-

700. In addition, beginning in May, 1967, Philip Tymon individually began making loans to Rego Crescent. These loans continued until December, 1978, at which time Philip Tymon was twenty-eight years old. Philip does not remember where the money for these loans came from in each instance, nor does he have records of these loans having been made, but he does recall that all of the money for the loans came from money he earned working at Rego Forest Country Club, which his father operated, or from gifts from his parents. (Tr., p. 27, p. 29) Philip also recalls that when some of the loans were made his mother had told him the corporation was short of funds; indeed, he stated that in late 1973 and early 1974, when about $175,000 was lent to the corporation, "I recall at that time there was (sic) some difficulties with the business and my mother discussed them with me, but I don't remember the details that well right now." (Tr., p. 34) These loans were at 15 per cent interest and the interest on the loans was compounded each time a new loan was made. (Tr., pp. 31–32) Although the record is clear that the interest of some other creditors who reinvested their money was compounded, (Tr., p. 65) it is not clear whether anyone, aside from Philip, receiving 15 per cent interest also had compounding, (Tr., p. 63) nor is it clear, in fact, whether anyone else received 15 per cent interest. (Tr., p. 52, p. 63) Carras testified that he could not say whether anyone else received that much. (Tr., p. 53) The typical rate of interest, however, was about twelve per cent, according to him. (Tr., p. 53)

Apparently, neither Philip nor the Trust received promissory notes or other evidence of indebtedness for their loans. (Tr., p. 13, p. 28) No interest was ever paid on either Philip's loans or the loans from the Trust after 1970. (Tr., p. 15) The only repayments testified to were the $4,000 returned to the Trust in April of 1973 and the Woodhaven Boulevard property conveyed to the Trust; (Tr., p. 13) apparently, there were no others. (Tr., p. 29) Nevertheless, I have no doubt that the loans were made by both the Trust and by Philip. The main reason for my belief is that both the contemporaneous records of the debtor (Tr., p. 67) and the Trust reflect the loans as having been made. Indeed, George Carras, the witness for the plaintiff who, as stated above, examined the Rego Crescent books to prepare a balance sheet, stated on cross-examination that, with regard to the loans from Philip, "[w]e have no reason to believe that they weren't made." (Tr., p. 67) I think that any factors which may raise suspicions as to the loans not having been made, such as the absence of personal records of Philip of his loans or the absence of any repayments over a period of years, are actually much more indicative of the casual manner in which intra-family financial affairs are oftentimes carried on.

The following are the Committee's contentions:

## A. EQUITABLE SUBORDINATION

■ The Committee first claims that the loans from Philip individually and from the Trust should be subordinated pursuant to 11 U.S.C. § 510(c) (1978). This section provides in pertinent part:

"(c) . . . the court may—

"(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; . . ."

The Committee argues that equitable subordination is appropriate for three reasons: first, because the loans by the Trust and Philip Tymon should be treated as capital contributions to the corporation because they were so intended; second, because the corporation was under-capitalized at the time some of the loans were made; and third, because of what the plaintiff characterizes as the "inequitable" conduct of the defendants. In determining whether the Committee is correct, this court must look to the case law that developed under the former bankruptcy law, as well as to the case law emerging under the current Code. See, e.g., H.R. No. 95–595, 95th Cong., 1st

Sess. (1977) 359; S.R. No. 95–989, 95th Cong., 2d Sess. (1978) 74, U.S.Code Cong. & Admin.News 1978, p. 5787. This law reveals that the Committee's position is untenable.

The Committee argues that subordination is appropriate first because the loans were "really a capital contribution." (Plaintiff's Post-Trial Memorandum at p. 7) The basis for this theory is that the loans bore a number of the earmarks of capital contributions rather than loans and should therefore be so treated. Plaintiff points to the facts that, for the loans of the Trust, no receipts, promissory notes, or other evidence of indebtedness were ever issued and no interest was paid after 1970. Plaintiff also claims that the defendants admit the loans were not really intended to be loans and that no repayment of principal was ever made after 1973. (Since I find that the monies transferred should be considered to be "loans" no matter how some of the family characterized them, and since I find that there was a repayment of the principal by the 1974 transfer of the Woodhaven Boulevard property, these last two arguments are of course irrelevant.) As to Philip's loans, the Committee maintains they should be considered in reality to be capital contributions for the following reasons: no receipts, promissory notes, or other evidence of indebtedness were ever issued for the loans, Philip kept no record of the amount, timing, or source of money for the loans, they were made when Philip's mother requested them, some of them were made at a time when Philip knew of "difficulties" of the corporation, no interest was paid on these loans while other lenders, except the Trust, received interest payments regularly, and no principal was ever repaid on any of the loans.

In support of its argument that the totality of these circumstances mandate the loans be treated as capital contributions, plaintiff cites a number of cases. Not one of the cases cited, however, and none that the court could find, establish the proposition plaintiff advances.

Plaintiff cites just one bankruptcy case, *Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.),* 599 F.2d 389, 393–94 (10th Cir.1979), and there is one bankruptcy case, *L & M Realty Corp. v. Leo,* 249 F.2d 668 (4th Cir.1957), cited in a quotation from *Mid-Town* that plaintiff relied on for its argument that since these loans look in some ways like capital contributions they should be treated by the court as capital contributions and therefore subordinated.

These cases do not, however, support plaintiff's case. In *Sinclair v. Barr, supra,* the court clearly held that, in determining whether monies advanced to a corporation should be considered capital, one critical determination is whether the initial capitalization of the corporation was inadequate. *Id.* at 393. Here, there is no claim that the initial capitalization of the corporation was inadequate and so that case clearly cannot control this one. In the other case, *L & M Realty,* the court found initial undercapitalization and approximately equal contributions in the form of loans from the stockholders in addition to numerous other indications that the loans should be treated as capital. *Id.* at 670. Again, those factors are absent here.

Finally, plaintiff cites two tax cases, *Alterman Foods, Inc. v. United States,* 505 F.2d 873 (5th Cir.1974), and *Spheeris v. Commissioner,* 284 F.2d 928, (7th Cir.1960), *cert. denied,* 366 U.S. 944, 81 S.Ct. 1673, 6 L.Ed.2d 855 (1961). In both cases, the legal issue was whether monies transferred from a corporation to a major shareholder should be considered to be dividends or loans for tax purposes: if the funds transferred were loans they were not taxable income to the recipient, while if they were dividends, they were taxable income. Clearly, the legal questions and policy considerations underlying that determination are so removed from determining whether money advanced should be considered capital contributions or loans for bankruptcy purposes that those cases are in no way relevant to the inquiry before this court.

Not only do the cases cited by the plaintiff fail to buttress its argument, but, in addition, policy considerations fail to support its case. While it is obvious that upon

bankruptcy stockholders of a corporation cannot suddenly claim that their capital investments in the corporation were really meant to be loans which are therefore entitled to the same status as that of general unsecured creditors, and while it is equally obvious that this court must scrutinize shareholder claims based on loans to make sure that a capital contribution has not at the eleventh hour been transmogrified into a loan on the corporate books, the plaintiff is not saying that either of these occurrences happened here. Rather, plaintiff's argument can be reduced to the proposition that relatives of stockholders or stockholders themselves cannot make loans to close corporations on such liberal terms that they resemble capital contributions, without having the debt generated by those loans subordinated in bankruptcy. Plaintiff claims that these loans were not evidenced by promissory notes, that the interest was not paid but was reinvested, that there was no set schedule to repay the principal, that Philip did not keep his own records of the loans, and that Philip's loans were sometimes made at a time when the corporation needed the money. What could these facts signify? They signify that a relative of the stockholders in a family corporation may have trusted its directors to keep proper records, that the punctilios of business practice generally observed among strangers were not observed between these family members, and that a relative of the directors of the corporation may have been willing to lend money to the corporation when the corporation needed it. Does that mean the loans were really capital or should be so treated? Only if there is merit in punishing those who are not sharp lenders to corporations run by their family members.

The second reason that plaintiff claims justifies treating the loans as capital contributions is that, at the time some of the loans were made, the corporation was undercapitalized. (Plaintiff's Post-Trial Answering Memorandum of Law, p. 8) As evidence of undercapitalization, the plaintiff points to the June 30, 1974 balance sheet which showed a capital deficit of $78,-000 and to Philip's testimony that at the time he made some loans to the corporation, his mother had told him the corporation needed the money. As I explain later in this opinion, this balance sheet does not convince me that the corporation was insolvent, nor, for the same reason, does it convince me that the corporation was undercapitalized. I accept Philip's testimony that at the time some of the loans were made, his mother had told him the corporation needed the funds, but that also does not mean that the corporation was "undercapitalized."

In *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the Supreme Court announced the test which has throughout the years had the adherence of the courts and on which the plaintiff relies. It said:

> "[S]o-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder ... where the paid-in capital is purely nominal, the capital necessary for the scope and operations of the company being furnished by the stockholder as a loan."

*Id.* at 309–310, 60 S.Ct. at 246–247, 84 L.Ed. at 291.

The Committee's argument is that the loans from Philip and from the Trust should be analyzed for capital contribution purposes as if they were made by a dominant or controlling shareholder because, for all practical purposes, Philip, the Trust, and Edward and Rose Tymon had an identity of interests. The Committee cites a case, *Fett v. Moore (In re Fett Roofing and Sheet Metal Co.),* 438 F.Supp. 726 (E.D.Va.1977), aff'd., 605 F.2d 1201 (4th Cir.1979), which did propose rigorous scrutiny for loans of relatives in *dicta,* see *id.* at 729, and certainly there are times when loans from relatives should be treated as if they were from principals. But even if the loans from Philip and the Trust are scrutinized with the same care as if they were from Rose and Edward, subordination is improper.

First, there is no general rule that debts based on shareholder loans will be subordinated in bankruptcy. No court has made this clearer than the Second Circuit when, in *In re Madelaine, Inc.,* 164 F.2d 419 (1947), the court stressed:

> "[t]here is nothing illegal in an officer or director lending money to his corporation provided he does not use his corporate position to defraud creditors or take unfair advantage of them. *Goldstein v. Wolfson,* 2 Cir., 132 F.2d 624, 626; *Arnold v. Phillips,* 5 Cir., 117 F.2d 497, 503. The case of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 248, 84 L.Ed. 281, is not to the contrary, for there the dominant stockholder used his claim for accumulated salary to defraud other creditors pursuant to a 'planned and fraudulent scheme.' *In the case at bar, as will appear from a later discussion, the claimants did not act fraudulently or take unfair advantage of creditors.* Hence the issue was solely one of fact—whether the funds they supplied to the corporation were advanced as loans or were put in as capital contributions."

*Id.* at 420 (Emphasis mine). *Madelaine* illustrates the tolerance with which courts have often approached insider loans and, more specifically, it illustrates the principle that even if the motive for a shareholder lending money to a corporation rather than contributing to capital is to protect part of his investment in the event of the subsequent bankruptcy of his corporation, his loans will not be subordinated for that reason alone. In *Madelaine,* a group of nine investors had purchased all the stock in a corporation, making four of their number members of the board of directors and officers. Each of the investors had contributed an equal sum of money to the corporation. This money had been contributed as loans rather than as capital because the investors felt that they could thereby best protect themselves in the event of the ultimate collapse of the corporation. *Id.* Nevertheless, the court held that in that case, subordination was not called for.

Numerous other courts have also stressed that ordinarily the mere fact that a loan is from an insider will not justify subordination of the debt arising from that loan. *See, e.g., Frasher v. Robinson, (In the Matter of Frasher, Inc.)* 458 F.2d 492, 493 (9th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972) (absent inequitable conduct, *bona fide* claims based upon loans from majority shareholders will not be subordinated); *Spach v. Bryant,* 309 F.2d 886, 889 (5th Cir.1962) (where, in a bad year for their farming corporation, the two shareholders thereof had paid themselves salaries of $50,000 and immediately lent that sum to the corporation, subordination is unappropriate because there had been no fraud or bad faith on the part of the stockholders); *Theriot v. Plane,* 126 F.2d 1015, 1016 (9th Cir.1942) (stockholder who owned approximately seventy-four per cent of the shares of stock of a corporation and served as general manager will not be subordinated where stockholder has not exercised his power adversely to the interests of fellow stockholders or general creditors); *Wheeler v. Smith,* 30 F.2d 59 (9th Cir.1929) (sole shareholder will not have his claim subordinated); *cf. Comstock v. Group of Investors,* 335 U.S. 211, 228–30, 68 S.Ct. 1454, 1463–64, 92 L.Ed. 1911, 1922–23 (1948) (parent company which had dominated and controlled subsidiary may have its claim for loan allowed in reorganization proceeding where parent's administration of subsidiary's affairs was in good faith, even though dividends were paid by the subsidiary at a time when it was borrowing the money represented by the claim).

These rulings are based on the two sound policies that shareholders should not be penalized for lending money to corporations in which they have stock and that corporations may be financed by loans as well as by capital contributions. Any other holding would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to help salvage a foundering company. The penalty for attempting to save the corporation should not be subordination. *See Sinclair v. Barr,* 599 F.2d 389, 392 (10th Cir.1979) ("We are unwilling to

find a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor. To hold the debt may be subordinated on that basis alone would . . . require all contributions [from principal shareholders] to be made in the form of equity capital."); *accord Collier on Bankruptcy,* ¶ 510.04, p. 510–13.

Plaintiff is correct in arguing that shareholders' loans have been subordinated because of undercapitalization in many cases, but most of them do not support plaintiff's case because they have arisen in factual settings where the court found that the *initial* capitalization of the companies was inadequate. *See, e.g., Arnold v. Philips (In re Southern Brewing Co.),* 117 F.2d 497, 501 (5th Cir.), *cert. denied,* 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941) (initial undercapitalization leads to subordination of debts arising from loans by majority shareholder to corporation during its first year of operation); *Fett v. Moore (In re Fett Roofing and Sheet Metal Co., Inc.),* 438 F.Supp. 726, 728, 731 (E.D.Va.1977); *cf. Duberstein v. Werner,* 256 F.Supp. 515 (E.D.N.Y.1966) (loans should be considered to be capital contribution when initial capitalization inadequate). The rationale for subordination in these cases is that by substituting loans for capital when the company is formed, the shareholders avoid risk not only to their personal assets, which are protected by the limited liability offered by corporate organization, but also avoid risk to that which by right ought to be at risk—the initial capital necessary to undertake the operations of the corporation. Here, of course, there is no showing of initial undercapitalization so this reasoning would not apply.

The other case in which courts have subordinated loans from shareholders on an undercapitalization theory is where the court has found that non-insider lenders would not lend money to the corporation at the time the loans were made. *See In re Trimble Company,* 479 F.2d 103, 116 (3rd Cir.1973) (the "test which may be used to decide whether a contribution by a proprietary interest is a loan or an additional injection of capital is whether the advance was made at a time when a bank or other ordinary commercial agency would be willing to lend it funds"). *But see Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.),* 622 F.2d 709, 717–18 (5th Cir.1980) (subsequent undercapitalization relevant for equitable subordination as evidence of initial undercapitalization or as evidence of inequitable conduct). That, too, has not been shown here. Indeed, the only case plaintiff cites which lends any support at all to its argument is *Boyum v. Johnson (In re Fergus Falls Woolen Mills Co.),* 127 F.2d 491 (8th Cir.1942), which states that when loans "[f]rom their amounts, duration, and continued need . . . were hardly mere ordinary commercial incidents, but rather part of a plan of permanent, personal financing, to avoid the necessity of increasing the capital of the corporation," *id.* at 494, they will be subordinated. This appears, however, to be just another way of saying that the corporation was underfinanced, without carefully developing a test for undercapitalization. At any rate, *Boyum* does not compel a finding for subordination here because the Committee has not made a showing that these loans were made to "avoid the necessity of increasing the capital of the corporation."

In short, plaintiff's argument for subordination based on undercapitalization fails primarily because plaintiff has not convinced me that Rego Crescent was undercapitalized at the time any of the loans were made.

The weakness of plaintiff's position is illuminated by the fact that even if there were evidence of undercapitalization, plaintiff might still not prevail because in many cases where the courts have subordinated debts arising from insider loans there has been some inequitable conduct in addition to undercapitalization. For example, in *Costello v. Fazio,* 256 F.2d 903 (1958), the Ninth Circuit held that the claims of two of three equal shareholders of a corporation should be subordinated to the claims of general unsecured creditors. In that case, the business of the corporation had operated as a partnership prior to incorporation.

Upon incorporation, stock was issued for a small amount and most of the capital that had been used by the partnership was taken out of the business and then loaned to the corporation. Finding that the corporation was from its inception "grossly undercapitalized," *id.* at 908, the court noted that:

"[m]uch more than mere undercapitalization was shown here. Persons serving in a fiduciary relationship to the corporation actually withdrew capital already committed to the business in the face of recent adverse financial experience. They stripped the business of eighty-eight per cent of its stated capital at a time when it had a minus working capital and had suffered substantial business losses. This was done for personal gain, under circumstances which carry with them knowledge that the corporation and its creditors would be endangered."

*Id.* at 910. *See also Braddy v. Randolph,* 352 F.2d 80, 82, 84 (4th Cir.1965), (subordination of debts from insiders' loans appropriate when company initially undercapitalized and insiders violated fiduciary duty); *International Telephone and Telegraph Co. v. Holton,* 247 F.2d 178, 182 (4th Cir.1957) (loans of parent company to subsidiary which was run for benefit of parent company and which began business with insufficient capital as part of parent's financing plan will be subordinated); *In re Sterling House, Inc.,* 356 F.Supp. 1113, 1116 (W.D. Va.1973) (loans from director and shareholder of family-held corporation which were necessary to make up for a deficiency in initial working capital and which were reflected on balance sheets shown to potential creditors as capital investments will be subordinated to claims of other creditors); *In re Dean and Jean Fashions, Inc.,* 329 F.Supp. 663, 668–69 (W.D.Okla.1971) (debts of corporation that was grossly undercapitalized because two shareholders stripped former partnership of its assets will be subordinated). In fact, the Ninth Circuit has squarely held that initial undercapitalization alone is not enough to justify subordination of insiders' loans. *Wood v. Richmond (In re Branding Iron Steak House),* 536 F.2d 299, 302 (1976).

Because the Committee has not proved inequitable conduct by the Tymons, its argument for subordination on that ground will fail as does its argument for subordination on the ground of undercapitalization. Plaintiff argues that it was inequitable for there to be any loans from Philip or the Trust because of the general financing arrangements of Rego Crescent and the Tymons. The arrangement was generally that the debts of Rego Crescent were guaranteed individually by Edward and Rose Tymon, so that, in the event that Rego Crescent went bankrupt, debts of the corporation based on loans from Edward and Rose would eventually be applied to the debts of the other unsecured creditors. Thus, Edward and Rose could not protect themselves by investing in Rego Crescent with loans instead of by capital contributions. The Committee argues that, should Philip or the Trust be allowed to share in the corporation's assets, Rose and Philip would have effectively created a "safe harbor" for their assets, and this "safe harbor" would be inequitable.

I see nothing at all inequitable in what the Committee characterizes as the "safe harbor" scheme. The reason this safe harbor exists is that Edward and Rose created a trust for Philip and gave gifts to Philip and the Trust. There is nothing wrong with this unless at the time the gifts were made, Rose and Edward were insolvent, which has not been shown here. Perhaps it could be argued that the "safe harbor" was inequitable if it were shown that Edward and Rose had assured Rego Crescent's creditors that no member of their immediate family would emerge from a Rego Crescent bankruptcy with protected assets, but that too has not been shown.

The above analysis of plaintiff's undercapitalization and inequitable conduct arguments would end the matter were it not for the language in the Supreme Court opinion, *Pepper v. Litton, supra,* which demands that transactions with insiders be subject to:

"rigorous scrutiny and where any of their contracts or engagements with the corpo-

ration is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."

*Id.* at 306, 60 S.Ct. at 245, 84 L.Ed. at 289.

Pointing to this language, plaintiff contends that it is the burden of Philip and the Trust to establish the fairness of the loans. No cases cited by plaintiff, however, evidence a court making an insider prove the fairness of a transaction when nothing more than a loan by an insider has been proven. Indeed, it would be problematical were any court to adopt such a rule, because the effect thereof could be to penalize unfairly innocent investors whose only fault might have been the failure to keep voluminous records necessary to justify innocent conduct called into question decades later.

Those courts which have carefully considered the precise question of burden of proof in equitable subordination cases involving insider loans have explained that "[t]o constitute the type of challenge contemplated by the [Supreme] Court, an objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety." *Benjamin v. Diamond (In the Matter of Mobile Steel Co.),* 563 F.2d 692, 701 (5th Cir.1977); *accord In re Castillo,* 7 B.R. 135, 3 C.B.C.2d 351, Bank.L.Rep. (CCH) ¶ 67692 p. 78232 (Bkrtcy.S.D.N.Y.1980). Only after the challenge based on a "substantial factual basis" is made need the insider justify the loan. Here, there is no substantial factual basis to support plaintiff's allegations of impropriety, and consequently defendants do not have to show either adequate initial capitalization or the absence of inequitable conduct.

## B. FRAUDULENT TRANSFER

In addition to arguing for equitable subordination, plaintiff argues that the 1974 transfer of the Woodhaven Boulevard property is fraudulent and that the estate should therefore be augumented by the difference between the fair market value of the property at the time of the transfer and the consideration that was actually given for the property.

Section 544(b) of the Code provides:

"The trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable ...."

Section 1107(a) of the Code gives the debtor-in-possession of an entity undergoing reorganization the rights of a trustee, and the case law has established that a creditors committee may have authority to bring an action on behalf of the debtor, *cf. Committee of Unsecured Creditors v. Monsour Medical Center (In the Matter of Monsour Medical Center),* 5 B.R. 715, 718, 6 B.C.D. 886, 888, 2 C.B.C.2d 1363, 1367 (Bkrtcy.W.D.Pa.1980).

In order for the Committee to be able to void a transfer under § 544, there must be an actual creditor of the debtor in existence who could void the transfer, B. Weintraub & A. Resnick, *Bankruptcy Law Manual,* ¶ 7.03, 7–5—7–6, (1980). The parties have stipulated that the Chemical Bank or Security National Bank has been a creditor of Rego Crescent from before 1974 until the present. The only remaining question, then, is whether under the applicable law, those creditors could have voided the transfer.

Plaintiff points to New York Debtor and Creditor Law, § 273 (McKinney 1945) which provides:

"Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

Section 278 provides:

"Where a conveyance ... is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase ... (a) have the conveyance set aside ...."

Section 271 gives the definition of "insolvency," and provides in pertinent part: "1. A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

 The definition of "fair consideration" is contained in § 272, which states that fair consideration is given for property:

"[w]hen in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."

Relying on this law, the Committee claims that the 1974 transfer of the Woodhaven Boulevard property from Rego Crescent to the Trust was fraudulent. To succeed, the Committee would have to show that the transferor was insolvent at the time of the transfer, that the transferor did not receive fair consideration for it, and that the defendant sought to be held liable is the transferee of the fraudulent transfer. *Seligson v. New York Produce Exchange,* 394 F.Supp. 125, 127–128 (1975). *Cf. Zachary v. Columbia University,* 77 A.D.2d 813, 430 N.Y.S.2d 766 (1980) (burden on trustee to show fraudulent conveyance); *Commercial Trading Company, Inc. v. Potter Securities Corp.,* 26 A.D.2d 761, 271 N.Y.S.2d 733, 734 (4th Dept. 1966), (trustee has burden of showing insolvency under § 273 of Debtor and Creditor Law), *Cohen v. Sutherland,* 257 F.2d 737, 740 (2d Cir.1958). The Committee's actions fails, however, for two reasons, each of which independently would have been sufficient to defeat its claim: the Committee was unable to prove either that the debtor was insolvent at the time of the conveyance or that the conveyance was without fair consideration.

As described above, the only evidence of the financial condition of the corporation offered by the Committee was the 1974 balance sheet, which shows total assets of $8,146,731, net value of real estate as $6,996,452, and a capital deficiency of $78,-811. The value of the property was determined by subtracting depreciation from the value of the property, which was computed by adding the cost of any improvements to historical cost. Clearly, a balance sheet prepared in this way cannot establish that the debtor was insolvent under § 271, which looks to the "fair salable value" of the debtor's assets.

Those courts which have considered the test of insolvency under § 273 have reiterated what is obvious—book value and fair salable value measure different things and book value does not establish fair salable value. *See, e.g., Seligson v. New York Produce Exchange,* 394 F.Supp. 125, 128–132 (S.D.N.Y.1975); *cf. Halsey v. Winant,* 258 N.Y. 512, 519, 180 N.E. 253, 256, *cert. denied,* 287 U.S. 620, 53 S.Ct. 20, 77 L.Ed. 539 (1932).

It is true that the court in *Greene v. Ellis,* 335 F.Supp. 981 (S.D.N.Y.1971), *aff'd,* 456 F.2d 1335 (2d Cir.1972), relied on by the Committee, used book value to determine fair salable value under § 271, but there the court specifically noted that it was "not shown any proof sufficient to warrant us to depart from it," *id.* at 983. Here, by contrast, the reason to depart from book value is obvious—most of the assets of the corporation came from real estate, the value of which cannot be expected to be reflected at all in the depreciated value used for the balance sheet. Moreover, since *Green* was decided the Southern District has reemphasized that real, rather than book value, is the critical factor in determining insolvency under the New York law, *see Seligson, supra.* More recently, the Second Circuit, in construing the definition of insolvency under § 67(d)(1)(d) of the Bankruptcy Act of 1898, which section is identical to § 271 of the New York Debtor Creditor Law in that it defines insolvency as "when the fair salable value" of a person's property is inadequate to pay his debts, stressed that market and book value are often different, *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (1981), and held that since the district court may have overly relied on book value in finding a corporation solvent, the case had to be remanded, *id.* at 995–96.

Even if the Committee had proven that Rego Crescent was insolvent at the date of the transfer, its action would fail because it

must also prove lack of fair consideration, which it cannot do. Fair consideration, as defined in the statute above, involves two elements: a "fair equivalent" and the giving of that fair equivalent in good faith.

I have no doubt that a fair equivalent was given for the Woodhaven Boulevard property. As I stated in my summary of the facts, I am satisfied that the understanding at the time of the transfer was that the consideration for the property was the Trust's taking subject to the mortgage and the forgiveness of the antecedent debt owed the Trust. As is clear on the face of the statute and from the cases decided under it, *see, e.g., Strongin v. International Acceptance Bank, Inc.,* 70 F.2d 248, 252 (2d Cir.), *cert. denied,* 293 U.S. 575, 55 S.Ct. 86, 79 L.Ed. 673 (1934), an antecedent debt is good consideration for the purposes of this statute.

A "fair equivalent" is not enough for fair consideration under the statute, however— the fair equivalent must be given in good faith.

"Good faith" as used in § 272 has recently been defined to encompass three elements:

"(1) an honest belief in the propriety of the activities in question;

(2) no intent to take unconscionable advantage of others; and

(3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others."

*Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 949 (1978); *accord Spear v. Spear,* 101 Misc.2d 341, 348, 421 N.Y.S.2d 277, 281 (Sup.Ct. 1979); *Sparkman & McLean Co. v. Derber,* 4 Wash.App. 341, 481 P.2d 585 (1971) (construing Washington's version of the Uniform Fraudulent Conveyance Act, which is identical to § 272 of the New York Debtor and Creditor Law).

Nothing shown to have occurred in this case reveals a lack of good faith in connection with the conveyance. The cases which have found an absence of good faith have been markedly different from this one. In *Spear v. Spear,* for example, the defendant, a divorced man who owed money for child support and alimony, had given a judgment on his home to a woman whom he was then dating and who had lent him money, knowing that, because of his lack of other assets, the effect of the judgment would be to "in effect ... wipe out the arrears [due his ex-wife] which were not yet protected by a judgment." *Id.* at 349, 421 N.Y.S.2d at 282. In *Southern Industries, Inc. v. Jeremias, supra,* an insolvent corporation transferred substantially all its assets to one of its directors in return for an antecedent debt. Both of these cases, then, involved entities that knew that they would be unable to pay their debts, and which had thus decided to give preferences. By contrast, there is no indication here that at the time of the conveyance of the Woodhaven Boulevard property the directors of Rego Crescent suspected that they would wind up in this court.

In sum, for the foregoing reasons, I hold that the debts of Rego Crescent to Philip Tymon and the Trust should not be equitably subordinated and that the conveyance of the Woodhaven Boulevard property to the Trust was not fraudulent. Judgment is rendered in favor of the defendants dismissing the complaint.

IT IS SO ORDERED.