In re PACIFIC EXPRESS, INC., a California corporation, Debtor.

In re PACIFIC EXPRESS HOLDING, INC., a California corporation, Debtor.

The UNSECURED CREDITORS' COM-MITTEE OF PACIFIC EXPRESS, INC., and Pacific Express Holding, Inc., Debtors, on Behalf of and In the Name of Pacific Express, Inc., and Pacific Express Holding, Inc., Debtors-In-Possession, Plaintiffs,

v.

PIONEER COMMERCIAL FUNDING CORPORATION, a New York Corporation, dba PCFC California, et al., Defendants.

Bankruptcy Nos. 284–00394–D–11, 284–00395–D–11.
Adv. No. 284–0361.

United States Bankruptcy Court, E.D. California.

Dec. 18, 1985.

Edward Tredinnick, Phelan, Stuppi, Sorensen & McQuaid, San Francisco, Cal., for Unsecured Creditors' Com.

Joel Zeldin, Dinkelspiel, Donovan & Reder, San Francisco, Cal., Mark Gorton, Cooper & Shaffer, Sacramento, Cal., for defendants.

## MEMORANDUM OPINION AND DECISION

LOREN S. DAHL, Bankruptcy Judge.

### FACTS

In the present matter before the court defendants, Pioneer Commercial Funding Corporation and its purchasers of participation shares (participants), move the court to dismiss the plaintiffs' complaint and/or for summary judgment. Simultaneously, plaintiffs, the unsecured creditors'

committees of Pacific Express, Inc. and Pacific Express Holding, Inc. urge the court to grant their cross-motion for summary judgment. The parties have asserted to the court that the material facts are undisputed.

Pacific Express Holding, Inc. was the parent corporation of its sole subsidiary, Pacific Express, Inc.; both corporations were organized in 1981. Pacific Express, Inc. was the company through which its parent operated a commuter airline business. Pacific Express, Inc. originally planned to service the San Francisco to Los Angeles corridor. However, in April 1982, due to the air traffic controllers' strike and the lack of terminal space at the San Francisco airport, Pacific Express [1] revised its business plan to service the smaller, more remote communities in California. At that time, Pacific Express sought additional funds to implement the revised plan.

On April 30, 1982, Pioneer Commercial Funding Corporation (Pioneer), a New York corporation doing business in California, and Pacific Express, Inc. entered into an accounts receivable financing arrangement. Pioneer agreed to loan money to Pacific Express, Inc. and, in return, Pacific Express, Inc. granted Pioneer a continuing lien and security interest in Pacific Express' accounts receivables. Thereafter, financing statements were filed with the California Secretary of State and the New York filing officer.

In October 1982, Pacific Express made a public stock offering to raise additional funds. The stock offering netted $5.6 million instead of the desired $10 million. In December 1982 or January 1983, a new management team of Pacific Express determined that the revised business plan would require an additional $4 million in cash. In the spring of 1983, Pacific Express had a negative net worth of $10 to $11 million dollars.

On April 18, 1983, after extensive negotiations, Pacific Express, Pioneer, and its participants entered into a participation agreement which provided that Pioneer would loan $4 million to Pacific Express, Inc. The loan was funded by the sale of participation shares in the loan to 66 participants. The sale of participation shares occurred in three closings. At the first closing the participants had agreed to purchase a total of $1,233,666 in participation shares. The purchase of additional shares at the later closings was optional. The participation agreement also provided that Pacific Express Holding, Inc. would issue 1.357 shares of its common stock to each participant for each dollar of participation share purchased. At the end of the third offering, on August 31, 1983, the Pioneer participants had purchased $3,999,998 worth of shares in the obligation of Pacific Express to Pioneer. The participants had also received a total of 5,427,997 shares of common stock.

Pursuant to the agreement, Pioneer loaned $4 million to Pacific Express, Inc. at an interest rate of seven percent a year with deferred payment of the interest. Sections 7.5 and 9.1 of the participation agreement stated that the holders of 60 percent of the participation shares could direct Pioneer to declare all principal, interest, and penalties to be immediately due and payable upon the default of Pacific Express or after July 1, 1986. The specific events which would constitute a default were also listed. In return for the loan Pacific Express, Inc. executed and delivered a senior secured note to Pioneer in the principal amount of $4 million. The accounts financing security agreement of April 30, 1982 was amended to include the $4 million note. An amended financing statement was filed with the California Secretary of State on April 22, 1983 which clarified and expanded the description of collateral in the original financing statement.

Section 9.2 of the participation agreement provided that upon the sale of Pacific Express Holding, Inc. common stock prior to July 1, 1986, in a private placement or

---

**1.** "Pacific Express" will be used throughout this opinion as a reference to both the parent, Pacific Express Holding, Inc., and its subsidiary, Pacific Express, Inc.

pursuant to an offering registered with the Securities and Exchange Commission at a minimum price of two dollars per share and which resulted in net proceeds to Pacific Express Holding, Inc. of at least $6 million, the principal amount due Pioneer under the $4 million note would be automatically cancelled. The agreement further stated that at any time the holders of 60 percent of the participation shares could vote to cancel all principal amounts due and such a vote would have the same effect as the automatic cancellation described above.

The 66 participants consisted of employees of Pacific Express and lenders who had no prior contact with Pacific Express. Shareholders, directors, and officers of Pacific Express also were participants.

On February 2, 1984, Pacific Express Holding, Inc. and Pacific Express, Inc. filed chapter 11 petitions. Shortly thereafter, on February 10, 1984, the court ordered the cases to be jointly administered. On May 25, 1984, the unsecured creditors' committees filed an application for authority to commence and prosecute actions against Pioneer in the name of the debtors. The application stated that it was appropriate and in the best interest of creditors that the unsecured creditors' committees commence the suit against Pioneer and its participants because of the "position of numerous participants in the management of the Debtors-in-Possession". After reviewing the application and the debtors' statement of non-opposition, the court granted the application on May 29, 1984.

On August 9, 1984, plaintiffs, the unsecured creditors' committees, filed a complaint to determine the status of creditors' claims and/or interest against Pioneer and the 66 participants. Thereafter, on March 7, 1985, the defendants filed a motion to dismiss and/or for summary judgment. Plaintiffs filed a cross-motion for summary judgment on April 8, 1985. Both motions were argued orally on May 3, 1985 and submitted on the briefs, exhibits, declarations, and oral argument.

Plaintiffs argue that the alleged secured loan of the defendants is, in reality, an equity interest in the debtors and that the court should use its inherent power to properly classify the claims. In opposition, defendants assert that plaintiffs' attempt to equitably subordinate their claims is not proper based upon the facts of this case.

## DISCUSSION

The court will first determine whether or not the participation agreement between Pioneer, the participants, and the debtor was an arms length transaction. This issue requires that the court review the relationship of the participants to the debtor.

■ Any transactions between a debtor and an insider of the debtor are subject to heavy scrutiny. 2 *Collier on Bankr.* ¶ 101.28 at 101–42.2 (15th ed. 1985). 11 USC Sec. 101(28) defines an insider of a corporate debtor as a director, officer or person in control of the debtor. The Supreme Court in *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) stated,

[a] director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. (Citations omitted).

*See also, Costello v. Fazio,* 256 F.2d 903, 910 (9th Cir.1958).

Turning to the participants in the present case, William E. Ayer and Michael R. Gaulke were members of the debtors' board of directors and participants. Stanley M. Cobb, Jr., chairman of the board and president of Pacific Express also purchased shares.[2] In addition, other officers of Pa-

2. The following amounts were invested by members of the board of directors of Pacific

Express:
Ayer     $90,000

cific Express, namely, Lawrence W. Olson, vice-president of finance; J. Gordon James, vice-president of operations; and Patrick McManus, an executive, were participants.[3] According to the deposition of Stanley M. Cobb, Jr. filed in support of defendants' motion, 32 out of the 65 (sic) participants were non-control employees or pilots and station agents. Cobb also said that 15 participants had no prior dealings with the debtors.

Citicorp Venture Capital, Ltd., the largest investor who purchased $971,499 in participation shares owned 17 percent of the outstanding Pacific Express stock both before and after the loan participation.[4] Menlo Venture Partners and Menlo Venture Corporation invested $876,000 and $95,498.34, respectively. According to defendants, William E. Ayer was an investor or representative of the Menlo Venture companies and became a member of the Pacific Express board of directors after the loan participation had been arranged.

At the hearing, defendants presented to the court an exhibit entitled "Pacific Express Ownership." That exhibit shows that after the loan participation had been arranged, the Pioneer participants owned approximately 65 percent of the common stock of Pacific Express.

Defendants argue that only Citicorp Venture Capital, Ltd. and Stanley M. Cobb, Jr. can be considered insiders at the time the participation agreement was arranged. Defendants continue that William E. Ayer, Michael R. Gaulke, and Patrick B. McManus became directors and executives at about the time the participation agreement was executed. Since 32 out of 66 partici-

pants were non-management employees and 15 of the participants had not had prior contact with the debtor, defendants deny that the participation agreement was an insider transaction.

Even though defendants technically may be correct in their analysis of which participants were insiders before the participation agreement was executed and which participants became insiders as a result of the agreement, the court finds that the entire transaction is still subject to close scrutiny. It is undisputed that after the agreement was executed, the 66 participants, as a collective group, owned 65 percent of the common stock. This large ownership interest gave the participants control over Pacific Express. At least six of the participants were directors and officers of the debtor and Citicorp Venture Capital, Ltd., one of the major shareholders prior to the agreement, also was a participant.

Along with their ownership of 65 percent of the common stock of Pacific Express the participants had the opportunity to exert even greater control over a company that had a negative net worth of $10 to $11 million. The holders of 60 percent of the participation shares could direct Pioneer to: 1. cancel all principal amounts due from Pacific Express at any time; 2. declare all principal, interest, and penalties to be immediately due upon the default of Pacific Express; or 3. declare all principal, interest, and penalties to be due at any time after July 1, 1986 regardless of a default. Citicorp Venture Capital, Ltd. and Stanley M. Cobb, Jr., whom the defendants admit were insiders, owned 26 percent of the participation shares.

---

Cobb     $71,530
Gaulke   $20,000
Loyal W. Wilson, a member of the board of directors, also invested $20,000. He resigned from the board in the spring of 1983.

**3.** The officers of Pacific Express invested the following amounts:
Olson     $28,500
James    $29,696
McManus $37,000

**4.** Defendants aver that the transaction was not a new issuance of stock but merely a redistrib-

ution of shares to the loan participants who were willing to invest from existing private investors who were unwilling to invest additional money. As proof of the redistribution, defendants state that Citicorp Venture Capital, Ltd. had a 17 percent ownership interest both before and after the transaction. Regardless if the transaction is characterized as an issuance or redistribution of stock, the participants owned 65 percent of the common stock as a result of the participation agreement.

The court finds that even though each participant may not have been an insider of Pacific Express at the time the agreement was arranged, the group of participants became insiders afterwards. Based upon the relationship of some of the participants to Pacific Express and the control over the company acquired by the group of participants, the court finds that the participation agreement was not an arms length transaction.[5]

The court next must decide whether or not it has the inherent power to classify the participants' claims.

■ It is well-settled that the bankruptcy court is a court of equity.[6] *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966); *Pepper v. Litton*, 308 U.S. 295, 303–04, 60 S.Ct. 238, 243–44, 84 L.Ed. 281 (1939); *In re Global Western Development Corp.*, 759 F.2d 724, 727 (9th Cir.1985). The bankruptcy court may ignore the form of a transaction and give effect to its substance. *Global Western*, 759 F.2d at 727; *In re Shumate*, 39 B.R. 808, 814 (Bankr.E.D.Tenn. 1984); *Matter of Imperial Heights Apartments, Ltd.*, 18 B.R. 858, 862 (Bankr.S.D. Ohio 1982). As a court of equity, the bankruptcy court may create new remedies where those at law are inadequate. *Global Western*, 759 F.2d at 727. However, the court's equitable powers must be exercised consistent with the Code. *Johnson v. First National Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied*, 465

U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *In re Burley*, 11 B.R. 369, 373–74 (Bankr.C.D.Cal.1981), *aff'd on other grounds*, 738 F.2d 981 (9th Cir.1984). The following statement from *Remington on Bankruptcy*, a treatise on the Bankruptcy Act of 1898, still is valid today,[7]

[the bankruptcy court] has incidental power to grant any equitable relief which may be necessary in the administration and distribution of the estate: thus it may order specific performance, it may reform written instruments, or decree restitution, even though no offer to return was pleaded. (citations omitted). J. Henderson, 1 *Remington on Bankr.* Sec. 22 at 48. (5th ed. 1950).

In the area of claims, 11 USC Sec. 502(j) provides in part, "[a] claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be disallowed according to the *equities of the case*" (emphasis added). If a claim can be reconsidered on equitable principles, it follows that a claim originally can be allowed or subordinated on the same basis. *See* Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy*, 15 Vand.L.Rev. 83 (1961).

Plaintiffs argue that the court has the power to properly classify defendants' claims as equity interests. Defendants reply that plaintiffs rely on equitable subordination in error.

■ The court agrees with plaintiffs that it does have the inherent power to classify

---

5. In reviewing the list of participants included in the complaint, the court notes that one of the debtors' former bankruptcy attorneys, Marvin S. Cohen, invested $75,000. The KEOGH plan of a law firm, who also formerly represented the debtors before this court, invested $30,000.

6. 28 USC Sec. 1481, which was repealed by the Bankruptcy Amendments and Federal Judgeship Act of 1984, provided in part, "[a] bankruptcy court shall have the powers of a court of equity". Although no statute was enacted in place of 28 USC Sec. 1481, 28 USC Sec. 151 provides in part, "the bankruptcy judges in regular active service shall constitute a unit of the district court". District courts, in turn, are vested with broad, equitable powers. *Handler vs. SEC*, 610 F.2d 656, 659 (9th Cir.1979); *United*

States v. Coca-Cola Bottling Co., 575 F.2d 222, 228 (9th Cir.1978) *cert. denied, Aqua Media, Ltd. v. United States*, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978).

7. More recently, courts have used their equitable jurisdiction in bankruptcy matters to order: the marshaling of assets (*In re United Retail Corp.*, 33 B.R. 150 (Bankr.D.Hi.1983)); the reopening of a case after discharge (*Beneficial Finance Co. v. Lazrovitch*, 47 B.R. 358 (E.D. Va.1983)); the late filing of a proof of claim (*In re Global Western Development Corp.*, 759 F.2d 724 (9th Cir.1985)); and the disallowance of claims when a claimant harassed a debtor to gain an advantage in state court litigation (*In re Keyworth*, 47 B.R. 966 (D.Colo.1985)).

defendants' claims in this case. This power to classify is but another example of a bankruptcy court's ability to use its equitable power in the proper case. The classification of the Pioneer participants' claims does have support in the Code. The unsecured creditors' committees have brought an action which could have been brought by the debtors. If the debtors had contested Pioneer's claim the debtors could have filed an objection to claim under 11 USC Sec. 502(a) and R. of Bankr.P. 3007. The court then would determine the amount, characterization, and allowance or disallowance of the claim. The complaint here essentially asks the court to determine how the Pioneer participants' claim should be characterized. The court's power to characterize these claims is consistent with the Code.

■ Since the court does have the inherent power to classify the participants' claims, the court next must determine how the claims should be classified. The question here is whether or not the claims are true economic and legal debts or proprietary interests in the debtors. Herzog and Zweibel, *supra*, at 94.

Plaintiffs argue that the alleged secured claims are in effect equity interests in the debtors. In opposition, defendants assert that the participation agreement was a bona fide secured loan transaction and it was not altered by the addition of equity features.

The appropriate standards to be used in determining whether advances are contributions to capital and not debts are stated in the tax cases. Herzog and Zweibel, *supra*, at 94. *Contra Long Island Lighting Co. v. Bokum Resources*, 40 B.R. 274, 296 (Bankr.N.M.1983); *Matter of Rego Crescent Corp.*, 23 B.R. 958, 962 (Bankr.E.D.N. Y.1982).[8]

■ The ninth circuit has identified eleven factors which influence the debt versus equity issue. The factors are: 1. the name given to the certificates as evidence of the debt; 2. the presence or absence of a maturity date; 3. the source of the payments; 4. the right to enforce the payment of principle and interest; 5. participation and management; 6. a status equal to or inferior to that of regular corporate creditors; 7. the intent of the parties; 8. "thin" or adequate capitalization; 9. identity of interest between creditor and stockholder; 10. payment of interest only out of dividend money; and 11. the ability of the corporation to obtain loans from outside lending institutions. *Bauer v. Commissioner*, 748 F.2d 1365, 1368 (9th Cir.1984); *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir.1970). A particular factor is not controlling or decisive and the court must look to the circumstances of each case. *Bauer*, 748 F.2d at 1368.

■ In the present case, various factors exist which indicate that this transaction was a stock purchase. In return for their advance, the participants received a participation certificate and certificates representing the number of shares of common stock. The alleged loan by the participants did not have a maturity date. Instead, the holders of 60 percent of the participation shares could direct Pioneer to declare all amounts due upon default or after July 1, 1986.[9] The seven percent below market interest rate and the deferral of interest payments do not indicate a loan transaction. As noted above, at least six members of the debtors' management staff were participants and Citicorp Venture Capital, Ltd., a major shareholder prior to the agreement, also was a participant.

---

**8.** In both the *Long Island Lighting Co.* and *Rego Crescent* cases the bankruptcy courts stated that the tax cases were irrelevant in determining whether money advanced should be considered capital contributions or loans for bankruptcy purposes. This court disagrees with those statements. Although admittedly the purpose of the inquiry in the tax cases differs from the purpose in bankruptcy cases, the basic question of char-

acterization is still the same. Thus, the standards should not differ.

**9.** It appears that Pioneer's role was that of a collection agent. The court agrees with plaintiffs that the participants are the real parties in interest.

The automatic cancellation feature of the debt should Pacific Express stock reach a certain value also indicates that the transaction was not a true loan. A lender generally looks to be repaid the amounts it advances with interest. Here, the amounts due the participants could be automatically cancelled by July 1, 1986 or 60 percent of the holders of participation shares could vote to cancel the debt at any time. This cancellation feature is not characteristic of a loan.

The defendants have filed numerous declarations from various participants who state that they intended to make a secured loan to Pacific Express with the hope that the loan would save the company and their jobs. Stanley M. Cobb, Jr. states in his deposition that numerous lenders who were contacted prior to the participation agreement refused to make any equity contributions to Pacific Express. Although these statements may be evidence that the participants intended to make a secured loan to Pacific Express, the court finds that more factors exist which indicate that the transaction was actually an equity investment.

Defendants argue that the stock was an "equity sweetner" similar to the warrants the Chrysler corporation gave the United States government in 1980 for its guarantee of $1.5 billion in loans from private investors to Chrysler. An "equity kicker" or "sweetner" has been defined as a reward for taking a risk. Brook, *Annals of Finance: The Kicker*, The New Yorker, January 7, 1985, at 47. The court finds that defendants' analogy is not persuasive. The most obvious difference between Chrysler and Pacific Express is that the former was not in bankruptcy and subject to judicial scrutiny. In addition, the Chrysler loan guarantee appears to have been an arms length transaction, unlike the present case. The government was clearly at risk in the Chrysler situation whereas here the participants bore no risk. They had a senior secured note and knew that should Pacific Express fail they could look to the security for repayment. In the alternative, if Pacific Express did well the participants could look to the stock value, which would more than double their initial investment. The participants received more than an "equity sweetner" because no risk was involved.[10]

Even if the participants' claims could be classified as secured claims, the final issue is whether or not their claims can be equitably subordinated pursuant to 11 USC Sec. 510(c). The participants argue that plaintiffs cannot prove the requisite inequitable conduct and thus their complaint must fail.

11 USC Sec. 510(c) states,

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

This section, which codified case law, had no parallel under the former Bankruptcy Act. The legislative history to Sec. 510(c) indicates that Congress did not attempt to limit the development of the doctrine by the courts. *See* H.R.Rep. No. 595, 95th

---

**10.** Defendants also cite *Long Island Lighting Co. v. Bokum Resources*, 40 B.R. 274 (Bankr, N.M. 1983) in support of their argument that a loan package can have some equity features and still retain its character as a loan. In that case, the Long Island Lighting Co. (LILCO) loaned Bokum Resources $51 million prior to Bokum's bankruptcy filing. In return, Bokum executed a promissory note which bore 10.5 percent interest. As security for repayment, Bokum made an assignment of leases, mortgage and security agreement. Bokum also gave LILCO warrants and agreed that LILCO could convert its note into preferred stock in the event of default. The bankruptcy court refused to subordinate LILCO's claim. *LILCO* is distinguishable from the present case. *LILCO*, like the Chrysler situation, involved an arms length transaction and was not subject to close scrutiny. The court in *LILCO* also relied on the doctrine of equitable subordination and hence looked for inequitable conduct by LILCO. 40 B.R. at 296. When the court did not find inequitable conduct, it held that LILCO's claim could not be subordinated. In the present case, the transaction is subject to close scrutiny and plaintiffs do not rely solely on equitable subordination.

Cong., 1st Sess. 359 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5963, 6314; *Matter of Colin,* 44 B.R. 806, 810 (Bankr.S.D. N.Y.1984).

Within the ninth circuit it is difficult to discern exactly when equitable subordination should be applied. In *Costello v. Fazio,* 256 F.2d 903, 910 (9th Cir.1958), the court held that two tests were involved: 1. "whether within the bounds of reason and fairness, such a plan can be justified" (quoting *Taylor v. Standard Gas Co.,* 306 U.S. 307, 315, 59 S.Ct. 543, 547, 83 L.Ed. 669 (1939)) or 2. when claims are filed by persons standing in a fiduciary relationship to the corporation, "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain" (quoting *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939)).

In subsequent cases, the ninth circuit has held that the claims of the majority shareholders of a bankrupt could not be subordinated without a showing of fraud, over-reaching or other inequitable conduct. *Frasher v. Robinson,* 458 F.2d 492, 493 (9th Cir.1972) *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). In *In re Ahlswede,* 516 F.2d 784, 788 (9th Cir. 1975) *cert. denied,* 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975) the court refused to subordinate the claim of a trustee of a spendthrift trust who had filed a claim against the estate of the beneficiary/bankrupt. The court found that the trustee's claim could not be subordinated absent inequitable conduct in acquiring or asserting the claim. And, in *In re Branding Iron Steak House,* 536 F.2d 299 (9th Cir.1976), the court refused to subordinate the claim of one of the controlling shareholders. The court stated, "subordination requires some

showing of suspicious, inequitable conduct beyond mere initial undercapitalization of the enterprise". 536 F.2d at 302.

Defendants insist that three elements must be shown before equitable subordination can be applied: 1. initial undercapitalization; 2. fiduciary status; and 3. inequitable conduct. The court finds that the elements are not as clearly stated in the ninth circuit cases as defendants state.[11] Although inequitable conduct does appear to be a requirement, it is not clear what type of conduct will suffice. *See* DeNatale and Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus.Law. 417 (1985).

The objective of equitable subordination is to "correct the liquidation results when the conduct complained of is inequitable or fraudulent in the broad sense, although it may be technically legal and not otherwise voidable." DeNatale and Abram, *supra,* at 422. It is important, therefore, for the courts to retain flexibility in applying equitable subordination.[12] *Id.*

In the present case, the demand feature of the loan allowed the participants to control when they would be paid. Or, the participants could elect to cancel the debt should the Pacific Express stock value rise. If the company failed, the participants could look to their security for repayment ahead of the unsecured creditors. As noted above, the participants were never at risk when they advanced money to a company that had a negative net worth of $10 to $11 million. Conversely, the unsecured creditors extended products and services to Pacific Express unaware that a group of loan participants had the option of calling their advances a secured loan if the company failed or an equity investment if the

---

**11.** Unlike the ninth circuit, the fifth circuit appears to have announced clearly the requirements of equitable subordination: 1. claimant must engage in inequitable conduct; 2. misconduct must result in injury to the creditors or confer an unfair advantage on the claimant; and 3. equitable subordination will not be inconsistent with the provisions of the bankruptcy act. *Matter of Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980); *Matter of Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977).

**12.** Courts have applied equitable subordination to remedy a violation of the automatic stay (*Matter of Sayman's Inc.,* 15 B.R. 229, 231 (Bankr.N.D.Ga.1981)) and to subordinate investors' claims when those investors were repaid their "seed money" with interest just prior to the filing of bankruptcy by an auction house. *In re Carolee's Combine, Inc.,* 3 B.R. 324, 328 (Bankr. N.D.Ga.1980).

company prospered. The unsecured creditors did not have a repayment guarantee but were at risk when they dealt with a company with such a large negative net worth. The participants shifted the risk of any loss to the unsecured creditors in a transaction that was not arms length and which put the participants in control of Pacific Express. This shifting of the risk was an inequitable result of the participation agreement. The court holds that such an inequitable result will satisfy the requirement of inequitable conduct. *See also Matter of Colin*, 44 B.R. at 810. This holding is consistent with the flexibility which should govern the development of the equitable subordination doctrine. When a court finds it necessary and proper, equitable subordination should be applied to financing arrangements which ultimately shift the risk of loss to other creditors.

██ Defendants assert that fiduciary status is a requirement for equitable subordination. Although the classic case for equitable subordination involves the claims of officers, directors or shareholders who are fiduciaries of the debtor, other shareholders, and creditors, *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), there is nothing in the legislative history or case law which indicates that the doctrine is limited to fiduciaries.[13]

The participation agreement created an inequitable result and gave the participants control over the debtor. Based upon these factors, the court will order the subordination of the participants' claims to the claims of the unsecured creditors. This holding should not create a chilling effect on future employee loans to financially troubled companies. If the transaction is fair and clearly a loan or clearly an equity investment, it should pass judicial scrutiny.

## CONCLUSION

The bankruptcy court, as a court of equity, has the inherent power to properly classify claims. In the participation agreement at issue, many factors indicate that the participants were actually equity interest holders in the debtors. In the alternative, even if the participants were secured creditors, equitable subordination will be applied to remedy an inequitable result.

As all parties have indicated to the court and the court agrees that no genuine issues of material fact exist, summary judgment is appropriate and will be granted for the plaintiffs. Plaintiffs are entitled to judgment as a matter of law.

This memorandum opinion and decision shall constitute findings of fact and conclusions of law. Counsel for the plaintiffs shall prepare and submit a judgment consistent with this opinion.

██

---

**13.** Courts have subordinated the claims of creditors who have dominated and controlled a debtor. *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *In re American Lumber Co.*, 5 B.R. 470, 478 (D.Minn. 1980); *In re T.E. Mercer Trucking Co.*, 16 B.R. 176, 189–90 (Bankr.N.D.Tx.1981). *See also In re Osborne*, 42 B.R. 988, 996 (W.D.Wis.1984) and cases cited therein.